**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JAMIE L. BRUCKER and | ) | Case No.: 19-31474 |
| ANGELA JANE BRUCKER, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| *************************************** | ) | |
| NANCY J. GARGULA, | ) | |
| United States Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No.: _____ |
| | ) | |
| DEIGHAN LAW LLC | ) | |
| f/k/a LAW SOLUTIONS CHICAGO LLC, | ) | |
| d/b/a UPRIGHT LAW LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| RONALD ALLAN BUCH, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

NOW COMES, NANCY J. GARGULA, the United States Trustee for Region 10 ("U.S. Trustee"), by Mark D. Skaggs, her attorney, and for her Complaint, states as follows:

**JURISDICTION AND VENUE**

1.     This is a complaint in which the U.S. Trustee is seeking compensatory and injunctive relief as well as the imposition of sanctions against Deighan Law LLC, formerly known as Law Solutions Chicago LLC, and doing business as UpRight Law LLC, ("UpRight Law") and Attorney Ronald A. Buch, who provided legal services to the Chapter 7 Debtors Jamie L. Brucker and Angela Jane Brucker ("Debtors") in case number 19-31474 now pending in the United States Bankruptcy Court for the Southern District of Illinois, East St. Louis Division.

2.      The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(b) and a general order of reference from the United States District Court for the Southern District of Illinois.

3.      This proceeding is both a constitutionally and statutorily core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O) in that it asserts only claims arising directly under title 11 of the United States Code.   Nevertheless, to the extent any of these proceedings are non-core, the U.S. Trustee consents to the entry of a final judgment by the Bankruptcy Court in accordance with the local rules of this Court.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

**Parties**

5.      Plaintiff is the duly appointed United States Trustee for Region 10, which includes the Southern District of Illinois.

6.      Plaintiff has standing and files this Complaint in her official capacity pursuant to 28 U.S.C. § 586(a) and 11 U.S.C. § 307.

7.      Defendant, UpRight Law is an Illinois limited liability company with its principal place of business in Chicago, Illinois.

8.      UpRight Law provided legal services to the Debtor in connection with the filing of a Chapter 7 bankruptcy case, docketed as case number 19-31474 (the "Bankruptcy Case").

9.      Defendant Ronald A. Buch, a member of the bar of this Court, purports to be a partner of UpRight Law ("Mr. Buch").   Mr. Buch executed and electronically filed the bankruptcy petition, schedules ("Schedules"), and the statement of financial affairs (the "Statement") in this case utilizing the Court's CM/ECF system.

10.     At some point in time in 2018, Mr. Buch purchased and became the owner of the firm formerly owned by William Mueller, the local partner attorney who electronically signed the

UpRight Law retainer agreement with Debtors.   Subsequently, UpRight re-assigned the Debtors'
local attorney referral to Mr. Buch.

11.     Robert E. Eggmann serves as the duly appointed Chapter 7 Trustee (the "Chapter
7 Trustee").

**Procedural History**

12.     Debtor filed her voluntary petition under Chapter 7 of Title 11 of the United States
Code (the "Bankruptcy Code") on October 30, 2019 (the "Petition").

13.     Mr. Buch signed Debtors' Petition on page 7 as counsel for Debtors.   Mr. Buch's
signature block on the Petition attests that he was filing this case as an attorney of UpRight Law.

**Factual Allegations Relevant to All Counts**

    *A.*     ***The Structure and Business Model of UpRight Law***

14.     UpRight Law operates primarily from its main office in Chicago, Illinois.

15.     As of June 1, 2015, UpRight Law had three equity members, Kevin Chern, Jason
Allen, and David Leibowitz (the "Equity Members").

16.     Between 2015 and his departure from UpRight Law in early 2019, Kevin Chern
was the managing partner and the attorney who had supervisory responsibility over the company's
attorney and non-attorney staff and local partners.

17.     UpRight Law asserts that Mr. Allen ceased his job functions in June 2018 and
signed his separation papers on July 18, 2018, while Mr. Chern officially resigned on February 19,
2019.

18.     Michael Deighan a/k/a Mike Deighan is now the majority equity member of
UpRight Law, and in and around May of 2019, the firm changed its legal name to Deighan Law
LLC. Following Mr. Chern's departure from UpRight Law, Mr. Deighan became and is now the
managing partner and attorney who has supervisory authority over the company's attorney and

non-attorney staff and local partners.   Online records for the State Bar of Michigan indicate that Mr. Deighan is licensed to practice in Michigan, while the online records of the Illinois Attorney Registration & Disciplinary Commission indicate that Mr. Deighan is not licensed to practice law in Illinois.

19.     UpRight    Law's    advertising,    including    its    website,    found    at https://www.uprightlaw.com/, states that UpRight Law is a debt relief agency and that it "help[s] people file for relief under the Bankruptcy Code."

20.     Prior to his departure from UpRight Law and Mike Deighan's succession as equity owner and Managing Partner, UpRight Law's website named Mr. Chern as the attorney responsible for the content of the site.   UpRight Law's website currently provides that "An attorney responsible for the content of this site is Mike Deighan, Esq., licensed in Michigan with an office at 79 West Monroe Street, 5th Floor, Chicago, Illinois 60603."   The website further directs prospective assisted persons who view it to click a link "To see the attorney in your area who is responsible for this advertisement."

21.     Below statements such as "We bring the law office to the living room," "Do you qualify for bankruptcy protection," "Get immediate access to legal help on your terms," and "Have 10 minutes? Get your bankruptcy questions answered here," UpRight Law's website advertises, among other things, that it provides a "free consultation" and represents that:

> "At UpRight Law, every day we look for ways to *Make Clients Love Us* and to *Find a Better Way*! By providing immediate legal help to people with limited means, even when they cannot afford to pay for legal services today, we advance these values. When we say, "get started for free," we mean it. Every day, UpRight Law starts providing debt relief assistance to dozens of clients even before they have paid us any money. We do ask that they make a commitment to pay something by scheduling a future payment, but we are committed to providing assistance now and placing our clients' immediate need for help first."

Available at www.uprightlaw.com (last accessed September 7, 2020).

22.     UpRight Law's advertising asserts that it is committed to "Increasing Efficiency

delivering fair and just outcomes effectively, without waste or duplication."

23.      UpRight Law commences cases in bankruptcy courts throughout the United States, including in this Court, through its affiliations with locally licensed attorneys.

24.      UpRight Law refers to its local attorneys (hereinafter, "Local Attorneys") as "limited partners" and/or "partner attorneys" based on the execution of a "Partnership Agreement."

25.      The Partnership Agreement provides for the division of fees between UpRight Law and the Local Attorney on a case by case basis based on the completion of certain tasks by the Local Attorney in a chapter 7 or a chapter 13 case.

26.      The Partnership Agreement also provides for the distribution of 1% of the profits generated in each jurisdiction to the Local Attorneys in that jurisdiction on a yearly basis.

27.      In chapter 7 cases, the Local Attorneys now receive up to thirty-three percent of the fees paid to UpRight Law.  The Local Attorney is responsible for all document collection and review and the preparation of the petition and schedules, with the exception of basic information – such as the debtors' address, the part of the statements of financial affairs concerning UpRight Law's compensation, and the preparation of the required Rule 2016 disclosures – which are all prepared by employees in UpRight Law's Chicago office.

28.      Mr. Buch signed Partnership Agreement with UpRight Law on June 26, 2018.

29.      Under this agreement, Mr. Buch receives 33% of the fees paid to UpRight Law by the clients whom UpRight Law refers to him if their cases are filed and the clients receive a discharge.

30.      Thus, UpRight Law retains approximately 67% of the fees in each chapter 7 case for providing an initial "consultation" with a non-attorney salesperson, preparing and obtaining a signed retainer agreement, managing the debtors' payments, and completing a small portion of the required petition, the statement of financial affairs question regarding payment of fees for

bankruptcy services, and the Rule 2016 disclosure to be filed with the court.

31.     UpRight Law calls its non-attorney salespersons "consultants."  A consultation, however, is the act of asking the advice or opinion of someone professionally qualified (such as a lawyer) to get their advice.  UpRight Law entices vulnerable consumers to contact it to get "immediate. . . legal help" and get their "bankruptcy questions answered" and be told if they "qualify for bankruptcy protection." But UpRight Law intentionally and systematically offers a "free consultation" it has no intention of providing.  Rather, prospective assisted persons and prospective debtors that contact UpRight Law are misled about such free consultations as they are subjected to a sales pitch from, primarily, non-attorney salespersons referred to by UpRight Law as "Senior Client Consultants."[1] Generally, prospective assisted persons or prospective debtors are not placed into contact with an attorney unless and until they agree to a "verbal retainer" and either make a payment to UpRight Law or set up an electronic draft for a payment if they are not able to make an immediate payment.  Then, UpRight Law's standard practice is to charge such clients for all time thereafter including the first communication such client has with any attorney, let alone the attorney that would be responsible for providing legal services to the client.

32.     The Debtors did not receive a free consultation with an attorney.

33.     The Debtors paid two-thirds of their attorney fee to UpRight Law for largely non-legal, **non-compensable** services and, in reality, only one-third of their attorney fee went to the person providing actual legal services.

34.     The pattern or practice of UpRight Law since its inception is to perform the debtors' initial "consultation" using primarily *non-attorney* staff employed in UpRight Law's Chicago office.

---

[1] The title of "Senior Client Consultants" in and of itself is misleading given that in approximately January 2017, UpRight Law did away with the employee title of "Client Consultants" such that since that time, there have not been any "consultants" junior to the "Senior Client Consultants."

35.     UpRight Law considers the activities of its "consultants" to be part of its "sale operations" and it has in the past trained its "consultants" to engage in high-pressure tactics and otherwise economically incentivized such employees to "close" sales, which practices and policies led to "consultants" engaging in the unauthorized practice of law.   Upon information and belief, UpRight Law continues to tie part of "consultants" compensation to fees collected.

36.     Thus, the pattern or practice of UpRight Law is for debtors' first ~~substantive~~ contact with UpRight Law to be with a "consultant" who is frequently a non-attorney. The non-attorney "consultants" are, essentially, telemarketers who are paid bonuses based at least in part upon the "sales" they make to prospective assisted persons and assisted persons.   Part of the salespersons' compensation package is based upon the amount of fees paid by the client within the first 30 days of the date of contact with UpRight Law.

37.     Thus, the salespersons have an incentive to sign-up new prospective assisted persons to file a bankruptcy case, regardless of the circumstances, regardless of whether the prospective assisted person is a good candidate for a bankruptcy case, and regardless of whether the prospective assisted person might be better advised not to file a bankruptcy case at all.

38.     In 2018, during the time the Debtors were making payments to UpRight Law, UpRight Law's gross sales and receipts were $28,683,556.

39.     UpRight Law non-attorney salespersons then provide the debtor information about the debtor's bankruptcy and non-bankruptcy options, including information as to the nature of the relief under each chapter of the Bankruptcy Code.

40.     There is evidence, as found by other bankruptcy courts, including the Western District of Virginia in *In re Williams,* 2018 WL 832894 (February 12, 2018), the Western District of Louisiana in *In re Banks,* 2018 WL 735351(February 6, 2018), *aff'd, Law Solutions Chicago LLC v. United States Trustee,* 592 B.R. 624 (W.D. La. 2018), *aff'd* 770 Fed. Appx. 168 (5th Cir.

2019), and the District of South Carolina in *In re Walker,* 604 B.R. 10 (D.S.C. 2019), that UpRight Law's non-attorney "consultants" often provide legal advice to potential clients, who are prospective assisted persons, including exemption information and information about which chapter of bankruptcy best suits their needs.

41.     A majority of UpRight Law's clients are assisted persons as that term is defined in the Bankruptcy Code.   Under UpRight Law's standard operating practices, the non-attorney "consultant" and potential client, who is often a prospective assisted person as defined under the Bankruptcy Code, agree on a bankruptcy option, without attorney input, and the "consultant" then establishes an agreed plan for the payment of the attorney's fees in the case.   This has resulted in an installment payment plan lasting on average between four and eight months, or even longer, in numerous cases that remain pending before this Court.

42.     After the non-attorney "consultant" reaches a payment agreement with the prospective assisted person, the "consultant" reads the prospective assisted person a "verbal retainer" which sets forth the purported conditions of the representation.

43.     Before the prospective assisted person ever speaks with an attorney, the non-attorney "consultant" takes the prospective assisted person's bank information and obtains permission from the prospective assisted person to take an initial ACH payment to UpRight Law. The "verbal retainer" does not provide the complete terms of the assisted person's engagement agreement with UpRight Law, such that, assisted persons make their initial payment and agree to ACH debits for attorney's fees to UpRight Law based on an incomplete understanding of the terms and scope of UpRight Law's representation.

44.     UpRight Law then sends the prospective assisted person a written retainer agreement under the signature of the Local Attorney.

45.     Under their agreements with UpRight Law, the Local Attorneys, including Mr.

Buch, delegate signature authority to UpRight Law for the purpose of affixing the Local Attorney's signature on the retainer agreements provided to prospective assisted persons.   UpRight Law's standard practice is to permit the non-attorney "consultants" or staff attorneys who are not the Local Attorney assigned to represent the prospective assisted persons to affix the Local Attorney's signature to the retainer agreement provided to prospective assisted persons. Accordingly, in the vast majority of cases, the Local Attorney whose signature appears on the retainer agreement has no knowledge of the existence of this new client, has not reviewed or approved the sending of the retainer agreement in each specific case, has not reviewed the proposed attorneys' fees for reasonability and, has not had a chance to check for conflicts prior to the execution of the retainer agreement on his or her behalf.

46.     According to UpRight Law's practices, the Local Attorney to whom the case is being assigned is then sent an email, or other electronic communication, instructing the Local Attorney to contact the client with a brief phone call, which UpRight Law calls a "compliance call."   The compliance call provides the misleading impression that an actual attorney will immediately begin providing substantive legal services to the assisted person.

47.     With the exception of the compliance call and responding to creditor inquiries concerning its retention, UpRight Law generally maintains the pattern or practice of performing only administrative and clerical work on the clients' matter, and withholding performance of any legal work to prepare the clients' bankruptcy case for filing, including the collection or the review of any documentation, until after the clients have paid their fees through any installment payment plan in full and the case is handed off to the local attorney.

48.     Thus, although UpRight Law maintains it is a proper law firm by virtue of its paper agreements with local attorneys, in reality, UpRight Law's organizational practice of providing prospective assisted persons and assisted persons with intake "consultations" with telemarketers

and only handing off their cases for legal representation to Local Attorneys after cases are paid in full creates a system of practice that is more like a referral service than a law firm.

49.     Typically, neither UpRight Law's Chicago office nor its Local Attorney send debtors document requests or otherwise begin preparing a case for filing until *after* the fees are paid in full.

50.     UpRight Law's practice of accepting fees on an extended installment plan and not even beginning the process of preparing any of the documents prior to full payment contributes to lengthy delays between UpRight Law's retention by a debtor and the filing of the case which far exceed the typical retention-to-filing timeline in other cases with counsel in the Southern District of Illinois who are not associated with UpRight law.

51.     As a result, it may take from nine months to a year, or even longer, from the date debtors make their first payment and retain UpRight Law before their chapter 7 case is finally commenced (if at all) in this District. For fifty (50) cases currently under review before this Court, the average length of time from the date of the first payment to UpRight Law to the date of the filing of the case is three hundred eighty-eight (388) days, or just over one year.

52.     UpRight Law has a demonstrated history of significant filing delays in the Southern District of Illinois from the date of the payment in full of UpRight Law's attorney's fees and the court filing fee.  For the fifty (50) cases currently under review before this Court, the average length of time from the date of payment in full of UpRight Law's attorney's fees and court filing fee to the date of the filing of the case is one hundred sixty-nine (169) days, or almost six months.

53.     Although UpRight Law advertises "immediate legal help" to prospective assisted persons, UpRight Law does not provide immediate legal help to prospective assisted persons and assisted persons until after UpRight Law has received payment in full of attorney's fees and court filing fee.

54.     Thus, UpRight Law's attorney referral operation is made apparent by its pattern and practice of failing to provide any substantive legal help to prospective assisted persons and assisted persons until the cases are paid in full and handed off to the local attorney for actual legal review and filing.

55.     However, to the extent UpRight Law attempts to operate as a national law firm, its managing partners, previously Mr. Chern and now Mr. Deighan, fail to adequately supervise UpRight Law's non-attorney staff and its Local Attorneys, to the detriment of the prospective assisted persons and assisted persons who are persuaded by UpRight Law's advertising and sales pitches to retain UpRight Law for bankruptcy assistance services.

56.     UpRight Law's pattern or practice of failing to immediately provide any substantive legal help to prospective assisted persons and assisted persons often results in such prospective assisted persons and assisted persons being subjected to lawsuits, judgments, and garnishments during the period after UpRight Law's retention and the ultimate filing of contracted for bankruptcy case in the Southern District of Illinois.

### B.     Facts Related to the Brucker Case

57.     Debtors are husband and wife with Mr. Brucker having one child for whom he pays child support.

58.     At all relevant times herein, Mr. Brucker was employed with Prairie Farms Dairy, Inc., and was paid $21.54 per hour and consistently worked a 40-hour week resulting in weekly gross earnings of $861.60.

59.     At all relevant times herein, Mrs. Brucker received social security income at the rate of $1,153.00 per month.

60.     On June 15, 2017, Prestige Financial Services, Inc. ("Prestige"), a creditor of Mr. Brucker, commenced a lawsuit against Mr. Brucker in the Circuit Court of St. Louis County,

Missouri, Associated Circuit Division, as case number 17SL-AC15130 ("Lawsuit"), seeking to collect on a deficiency balance owed on a loan secured by a 2010 Nissan Cube automobile that Prestige had repossessed and sold with the proceeds from the sale being insufficient to pay-off the loan balance.

61.    On July 25, 2017, Prestige obtained a judgment in the Lawsuit in its favor and against Mr. Brucker in the total amount of $13,088.78 plus court costs, with post-judgment interest accruing at the contract rate.

62.    On August 16, 2017, Prestige commenced wage garnishment proceedings within the Lawsuit against Mr. Brucker's wages at Prairie Farms Dairy, Inc.

63.    From the date of commencement of the wage garnishment proceedings and through the date Debtors retained UpRight Law, as more fully discussed below, Prestige received a total of $3,005.73 through the wage garnishment proceedings (2017: $1,165.57 + 2018 through 06/29/2018: $1,840.16).

64.    Debtors first contacted UpRight Law on June 29, 2018, after having performed a search on the Internet, which resulted in UpRight Law appearing as one of the first few results.

65.    Debtors then clicked on the UpRight Law website and reviewed the materials contained therein.

66.    Also on June 29, 2018, Debtors called UpRight Law and spoke with Chicago-based UpRight Law employee, non-attorney salesperson Pierre Estes ("Mr. Estes") ("First Call").

67.    Debtors' communication with Mr. Estes during the First Call convinced Debtors to file bankruptcy, to file a petition under chapter 7 and not chapter 13, to utilize the services of UpRight Law to file their bankruptcy case, and that they would pay UpRight Law the quoted sum of $1,725.00 in attorney's fees plus the court filing fee of $335.00 to accomplish their filing. Debtors were also required to pay the costs of the pre-filing credit counseling and post-filing

financial management course on their own and in addition to the attorney's fees and court filing fee.

68.     Debtors' attorney's fees to UpRight Law are significantly higher than those typically charged by UpRight Law Local Attorneys in the Southern District of Illinois than when the Local Attorney files a case under his own name and not under the UpRight Law name.

69.     During Debtors' First Call with Mr. Estes, Debtors provided their debit card information in order to make monthly payments to UpRight Law for its attorney's fees and the payment of the court filing fee.

70.     On July 6, 2018, Debtors debit card was charged an initial down payment of $200.00 to UpRight Law for its attorney's fees.   Thereafter, Debtors made monthly payments of $200.00 on the 4th, 5th or 6th of each month thereafter until February 2019, when Debtors made an additional payment of $460.00 on February 28, 2019, resulting in UpRight Law's attorney's fees and the court filing fee of $335.00 being paid in full.

71.     At the time of Debtors' First Call with Mr. Estes on June 29, 2018, Mr. Brucker's wages from his employment with Prairie Farms Dairy, Inc., continued to be subject to the Prestige wage garnishment proceeding.

72.     On June 29, 2018, Debtors signed a Retainer Agreement with UpRight Law, a copy of which is attached hereto as Exhibit 1 ("Retainer Agreement").

73.     The Retainer Agreement consists of ten (10) pages and was emailed by UpRight Law to Debtors on June 29, 2018 at approximately 12:57 p.m. as a package of documents to be read, reviewed, and then signed by the Debtors.   The signed Retainer Agreement was then sent to UpRight Law.

74.     As of the moment Debtors signed the Retainer Agreement, they had not spoken with an attorney from UpRight Law concerning the representation and the issues concerning the bankruptcy filing.

75.     Four days *after* first speaking with Mr. Estes, on July 3, 2018, a date on which the Prestige wage garnishment proceeding against Mr. Brucker's wages remained in effect and was continuing to result in the loss of earned wages, Debtors received a phone call from Mr. Mueller wherein Mr. Mueller appears to have discussed with Debtors, their financial condition, which would presumably include a discussion of the Prestige wage garnishment proceeding and the available options to terminate the wage garnishment proceeding as quickly as possible, and then "approved the case."

76.     On June 29, 2018, four days *before* speaking with Mr. Mueller, Debtors signed a Retainer Agreement with UpRight Law. A copy of the Retainer Agreement is attached hereto as Exhibit 1 ("Retainer Agreement").

77.     Over the course of the next eight months, Debtors made their installment payments to UpRight Law for the fees and costs associated with her bankruptcy filing so that, as soon as their payment plan was completed, UpRight Law would file their bankruptcy case as represented by UpRight Law in the second bullet point on page 1 of the Retainer Agreement.

78.     On October 1, 2018, three months after Debtors had retained UpRight Law, one of Debtors' creditors, Kathy Oliver, filed a lawsuit in St. Clair County Circuit Court identified as case number 2018-SC-3021 against Mr. Brucker relating to alleged damages and losses in connection with a residential lease agreement ("Second Lawsuit").

79.     Mr. Brucker was served with the Second Lawsuit on October 2, 2018 advising Mr. Brucker to appear in St. Clair County Circuit Court, in Belleville, Illinois on November 19, 2018 if he wanted to contest the merits of the Second Lawsuit.

80.     Despite having signed a Retainer Agreement with UpRight Law, having by then paid $1,000.00 to UpRight Law for its attorney's fees and allegedly having spoken with Mr. Mueller concerning their financial situation, Mr. Brucker appeared unrepresented for the first-appearance court hearing in St. Clair County Circuit Court on November 19, 2018 to respond to the Second Lawsuit.

81.     In order to appear and be heard on the merits by the Court in the Second Lawsuit, Mr. Brucker was required to pay an entry of appearance fee in the amount of $177.00 to the St. Clair County Circuit Clerk.   Mr. Brucker paid the required entry of appearance fee in the Second Lawsuit on November 19, 2018, at a time when the Prestige wage garnishment proceeding continued on a weekly basis to deduct money from his paycheck.

82.     Had Mr. Brucker not paid the entry of appearance fee of $177.00 and instead applied that money toward the UpRight Law attorney's fees, Debtors would have then paid the sum of $1,177.00 in UpRight Law attorney's fees, an amount which is greater than the regular fee charged by Mr. Buch when he files cases under his own name rather than as a partner of UpRight Law.

83.     On January 14, 2019, a trial on the merits was held in the Second Lawsuit with the St. Clair County Circuit Court ruling in favor of Ms. Oliver on her complaint and against Mr. Brucker on his counterclaim resulting in a judgment against Mr. Brucker in the amount of $1,826.99, inclusive of costs.

84.     Thereafter, on January 28, 2019, Ms. Oliver filed post-judgment actions to implement her own wage garnishment against Mr. Brucker's wages earned from Prairie Farms Dairy, Inc.   This civil process included the service of the wage garnishment filing being served on Mr. Brucker's employer.

85.     On or about February 11, 2019, Mr. Brucker's employer responded to the wage garnishment interrogatories required to be completed by the employer indicating that the wage garnishment withholding formula resulted in a negative number such that Ms. Oliver would not receive any funds pursuant to her attempted wage garnishment action.

86.     A copy of the wage garnishment interrogatories was sent via U.S. Mail to Mr. Brucker.

87.     On February 12, 2019, one of the Debtors called UpRight Law to discuss the wage garnishment proceeding taken by Ms. Oliver in the Second Lawsuit.[2]   Upright Law Marty Labelle, who is not an attorney, spoke with Debtors for a period of less than 6 minutes concerning the wage garnishment proceedings filed in the Second Lawsuit.

88.     During the eight-month period after Debtors' retention of UpRight Law and the date UpRight Law's attorney's fees and the court filing fee were paid in full (06/29/2018 – 02/28/2019), other than the brief welcome call from Mr. Mueller, UpRight Law's Local Attorney who was to represent Debtors in their case had no contact with Debtors.

89.     Debtors made their last payment of attorney's fees and court filing fee costs to UpRight Law on February 28, 2019.

90.     Mr. Buch was notified the next day that Debtors had paid their attorney's fees and costs in full and the file was handed-off to Mr. Buch.

91.     On March 1, 2019, after the UpRight Law attorney's fees and costs had been paid in full, Mr. Buch had a telephone conversation with the Debtors lasting less than 12 minutes (his first conversation with the Debtors) concerning the documents UpRight Law asserted they needed to complete Debtors' bankruptcy filing.   This was Mr. Buch's first call with Debtors.

---

[2] Ms. Oliver's wage garnishment proceeding in the Second Lawsuit did not result in a deduction against Mr. Brucker's wages given that his wages were already subject to the Prestige wage garnishment proceeding which, pursuant to Illinois law, prohibited further wage deductions until the Prestige wage garnishment proceeding was completed or otherwise released.

92.     On March 13, 2019, when Mr. Brucker's wages had been garnished in the amount of $3,130.18 since the date UpRight Law's retention (6/29/2018), Debtors had their first face-to-face meeting with an UpRight Law attorney, Mr. Buch, concerning their bankruptcy filing.   At that appointment, Mr. Buch discussed, for the first time, the specific documents necessary to prepare and complete their bankruptcy filing.

93.     Debtors' income information was also provided to UpRight Law during Mr. Buch's March 12, 2019 meeting with Debtors.

94.     Shortly thereafter, Debtors completed their pre-filing credit counseling class.

95.     Because Debtors' Bankruptcy Case was not filed until October 30, 2019, more than one hundred and eighty-days after Debtors completed their pre-filing credit counseling class, Debtors were required to and did attend and pay for a second pre-filing credit counseling class.

96.     On March 15, 2019, as requested by Mr. Buch, Debtors paid the costs for obtaining their credit reports despite UpRight Law's representation that the attorney's fees and costs included their credit reports.   Also at that time, Debtors provided UpRight Law with the name of the recipient of the domestic support obligation paid by Mr. Brucker.

97.     Nevertheless, despite the weekly wage garnishment being deducted from Mr. Brucker's wages, UpRight Law continued to instruct the Debtors that it was *absolutely mandatory* that before the Bankruptcy Case could be filed, Debtors must provide UpRight Law with every pay advice for the six-month period prior to the filing of the case.

98.     On October 30, 2019, sixteen months after Debtors paid their initial payment to UpRight Law, eight months after Debtors had paid UpRight Law in full, all while Mr. Brucker's wages were subject to the Prestige wage garnishment proceeding, and, being subject to the Second Lawsuit in which Mr. Brucker paid $177.00 to appear in the case and had to appear in court on

two different business days presumably missing work and the associated pay or incurring the expenditure of vacation or personal time, Mr. Buch filed the Bankruptcy Case.

99.     Debtors are not the only assisted person represented by UpRight Law in the Southern District of Illinois where there were significant delays between payment in full to Upright Law and filing of the assisted person's bankruptcy case.

100.     Moreover, Mr. Buch is not the only UpRight Law Local Attorney who has delayed filing UpRight Law's clients' cases in the Southern District of Illinois.   Accordingly, the delays from payment in full to filing are part of UpRight Law's pattern or practice in the Southern District of Illinois.

101.     Upon information and belief, the delays in filing UpRight Law's clients' cases result in part from UpRight Law's practice of providing clients little to no legal services until after clients are paid in full.

102.     Due to UpRight Law's business model, wherein UpRight Law systematically provides minimal administrative and clerical services and does not hand off cases to Local Attorneys to commence work on preparing and filing debtors' cases until after payment in full, Debtors suffered significant financial hardship and loss from the Prestige garnishment.

103.     Moreover, even after Mr. Buch was handed off the referral from UpRight Law on March 1, 2019, Debtors suffered further financial hardship and loss due to wage continuing garnishments for another ~~seven~~ eight months until their case was finally filed.

104.     Debtors' petition indicates that their debts are primarily consumer debts and they listed total property, including non-exempt property, totaling $5,987.00; as such, Debtors are an assisted person as that term is defined in 11 U.S.C. § 101(3).

## **Count I – Violation of Section 526(a)(1) of Title 11**

105.    All of the preceding paragraphs this Complaint are incorporated herein by reference.

106.    UpRight Law is a debt relief agency as defined in 11 U.S.C. § 101(12A) and advertises its services as such.

107.    Mr. Buch is a debt relief agency as defined in 11 U.S.C. § 101(12A) and advertises his services as such.

108.    At all times relevant to this complaint, the Debtors were prospective assisted persons or assisted persons as defined in 11 U.S.C. § 101(3).

109.    UpRight Law advertises and offers bankruptcy assistance services, as defined in 11 U.S.C. § 101(4A), and represents to substantially all potential clients and/or prospective assisted persons that it is efficient in the filing of bankruptcy cases and that it will provide immediate legal help to prospective assisted persons.

110.    In agreeing to represent Debtors in this Bankruptcy Case, and by entering into a representation agreement with Debtors to file a Chapter 7 Bankruptcy Case, UpRight Law represented to Debtors its ability to file a Chapter 7 Bankruptcy Case in the Southern District of Illinois within a reasonable amount of time after Debtors completed their payments to UpRight Law.

111.    Specifically,    UpRight    Law    represented    to    Debtors    that:

✔    **We fight for you.**  Once you sign, we will work tirelessly and fight for *your rights* to get you on the path to financial freedom.

✔    **We start work immediately.** We will start by *immediately* taking your creditor calls and preparing your case. As soon as your payment plan is completed, we will get you filed for bankruptcy.

112.    The Retainer Agreement specifically represents: "***Firm will immediately begin***

***providing Services and accrue billable time. Services include all representation to complete***

***Client's legal matter,*** except Agreement does not include representation in any objection to

discharge, adversary proceeding or any heavily contested matter or Services that could not have

been contemplated after reasonable diligence by Firm when this Agreement was signed

("Additional Services")." (emphasis added)

113.   Neither UpRight Law nor Mr. Buch provided immediate legal help to the Debtors.

114.   Debtors sought assistance from UpRight Law on June 29, 2018.

115.   SCC Estes, a non-attorney salesperson for UpRight Law, provided Debtors with

their initial legal consultation on behalf of UpRight Law on June 29, 2018.

116.   UpRight Law's non-attorney salesperson took payment from the Debtors, obtained

from the Debtors their agreement to a "verbal retainer" to prepare and file a chapter 7 bankruptcy

case, and set up a payment plan for them to pay for bankruptcy assistance on June 29, 2018, four

days before Debtors spoke to an attorney.

117.   Debtors signed their retainer agreement on June 29, 2018, four days before

speaking with an attorney licensed to practice law in the State of Illinois.

118.   After Debtors' initial payment of UpRight Law's attorney's fees, participating in

the "compliance" call with Mr. Mueller, and the signing of their retainer agreement with UpRight

Law, Mr. Brucker attended a hearing on the Second Lawsuit, paid the entry of appearance fee of

$177.00 and was subjected to a judgment in the Second Lawsuit.

119.   During the months from June 29, 2018 until February 28, 2019, UpRight did not

provide the Debtors with a check list of documents to gather, did not begin to prepare or review

the Petition, did not request that the Debtors save copies of paystubs and bank statements, and,

contrary to their promises they would provide immediate legal help, failed to act with appropriate

diligence to ensure the Debtors' case was filed in a diligent manner.

120.    Despite speaking with SCC Estes, agreeing to retain UpRight Law, and making not only the initial payment but all of the payments pursuant to the UpRight Law retainer agreement, Debtors did not receive any substantive legal help from UpRight Law or Mr. Buch until nearly eight months later on March 13, 2019.

121.    In this District, after its non-attorney salespersons sign up its clients, as part of its business model, UpRight Law has a pattern or practice of not providing prospective assisted persons and assisted persons with immediate substantive legal help or bankruptcy assistance for many months, until after the prospective assisted person and assisted persons have paid all attorney's fees and court filing fees in full.

122.    In this District, after its non-attorney salespersons sign up its clients, as part of its business model, UpRight Law intentionally does not provide prospective assisted persons and assisted persons with immediate substantive legal help or bankruptcy assistance for many months, until after the prospective assisted person and assisted persons have paid all attorney's fees and court filing fees in full.

123.    Debtors paid their attorney's fees and court filing fees in full to UpRight Law on February 28, 2019, but their bankruptcy case was not commenced on their behalf until eight months later on October 30, 2019.

124.    From the date of Debtors' retention of UpRight Law on June 29, 2018 through the date when UpRight Law's attorney's fees and the court filing fee were paid in full on February 28, 2019, Mr. Brucker suffered wage garnishment deductions totaling $3,061.70.

125.    From the date when UpRight Law's attorney's fees and the court filing fee were paid in full by Debtors on February 28, 2019 through the date of the commencement of the Bankruptcy Case (October 30, 2019 – 244 after the fees were paid in full and 488 days after

Debtors retained UpRight Law), Mr. Brucker suffered wage garnishment deductions totaling $2,766.19.

126.    In total, from the date Debtors retained UpRight Law to fight for them to get them on the path to financial freedom and to immediately start preparing their case, Debtors suffered wage garnishment deductions of $5,827.89, which sum was paid to Prestige on an unsecured, non-priority debt dischargeable in bankruptcy.

127.    UpRight Law and Mr. Buch failed to advise Debtors of available legal options which would have allowed Debtors to quickly file their petition for bankruptcy relief, including the option to pay the Court filing fee through installments utilizing Official Form 103A, which would have allowed for the immediate invocation of the automatic stay and the termination of the weekly wage garnishment deduction against Mr. Brucker's wages.

128.    UpRight Law and Mr. Buch failed to properly advise Debtors of the legal option to commence the Bankruptcy Case by filing the Voluntary Petition and the creditor matrix initially with the remaining required schedules within fourteen days thereafter, or such other time as the Bankruptcy Court may have permitted.   Again, this would have allowed for the sooner invocation of the automatic stay and the termination of the weekly wage garnishment deduction against Mr. Brucker's wages.

129.    UpRight Law has a demonstrated history of failing to timely file cases in the Southern District of Illinois, thus demonstrating a pattern or practice of excessively delayed case filing.

130.    UpRight Law has been found by other bankruptcy courts not to timely file cases, thus demonstrating a pattern or practice of excessively delayed case filing.

131.    UpRight Law and its local partner attorneys have filed numerous cases in this District since January 2019 which demonstrate lengthy filing delays from the time UpRight Law

was paid in full.

132.    UpRight Law has a clear and consistent pattern or practice of representing to debtors that it can, and will, file a bankruptcy case in this District within a reasonable amount of time, while at the same time having a demonstrated record of failing to do so.

133.    UpRight Law failed to timely file a Chapter 7 Bankruptcy Case in the Southern District of Illinois after the completion of the Debtors' payments.

WHEREFORE, the Plaintiff prays for a final order and judgement on Count I:

A.  Finding that both Defendants violated 11 U.S.C. § 526(a)(1);

B.  Finding that such violations by UpRight Law were part of clear and consistent pattern or practice or were done intentionally;

C.  Imposing an injunction pursuant to 11 U.S.C. § 526(c)(5)(A) against UpRight Law and barring UpRight Law from engaging in conduct which would violate Section 526(a), including representing to Debtors that it is "efficient" or able to timely file a case or that it will provide immediate legal help; and,

D.  Imposing an appropriate civil penalty pursuant to § 526(c)(5)(B) of the Bankruptcy Code not to exceed $25,000 against UpRight Law and not to exceed $2,500 against Mr. Buch.

## Count II- Violation of Section 526(a)(3) of Title 11

134.    All of the preceding paragraphs of this Complaint are incorporated herein by reference.

135.    UpRight Law is a debt relief agency as defined in 11 U.S.C. § 101(12A) and advertises its services as such.

136.    Mr. Buch is a debt relief agency as defined in 11 U.S.C. § 101(12A) and advertises his services as such.

137.    At all times relevant to this complaint, the Debtors were a prospective assisted person or an assisted person as defined in 11 U.S.C. § 101(3).

138.    UpRight Law advertises and offers bankruptcy assistance services, as defined in 11 U.S.C. § 101(4A), and represents to substantially all potential clients and/or prospective assisted persons that it is efficient in the filing of bankruptcy cases and that it will provide immediate legal help to prospective assisted persons.

139.    In agreeing to represent Debtors in this Bankruptcy Case, and by entering into a representation agreement with Debtors to file a Chapter 7 Bankruptcy Case, UpRight Law represented to Debtors its ability to file a Chapter 7 Bankruptcy Case in the Southern District of Illinois within a reasonable amount of time after Debtors completed their payments to UpRight Law.

140.    Specifically,   UpRight   Law   represented   to   Debtors   that:

✔ **We fight for you.**  Once you sign, we will work tirelessly and fight for *your rights* to get you on the path to financial freedom.

✔ **We start work immediately.** We will start by *immediately* taking your creditor calls and preparing your case. As soon as your payment plan is completed, we will get you filed for bankruptcy.

141.    The Retainer Agreement specifically represents: "***Firm will immediately begin providing Services and accrue billable time. Services include all representation to complete Client's legal matter,*** except Agreement does not include representation in any objection to discharge, adversary proceeding or any heavily contested matter or Services that could not have been contemplated after reasonable diligence by Firm when this Agreement was signed ("Additional Services")." (emphasis added)

142.    Neither UpRight Law nor Mr. Buch provided immediate legal help to the Debtors.

143.    Debtors sought assistance from UpRight Law on June 29, 2018.

144.    SCC Estes, a non-attorney salesperson for UpRight Law, provided Debtors with their initial legal consultation on behalf of UpRight Law on June 29, 2018.

145.    UpRight Law's non-attorney salesperson took payment from the Debtors, obtained from the Debtors their agreement to a "verbal retainer" to prepare and file a chapter 7 bankruptcy case, and set up a payment plan for them to pay for bankruptcy assistance on June 29, 2018, four days before Debtors spoke to an attorney.

146.    Debtors signed their retainer agreement on June 29, 2018, four days before speaking with an attorney licensed to practice law in the State of Illinois.

147.    After Debtors' initial payment of UpRight Law's attorney's fees, participating in the "compliance" call with Mr. Mueller, and the signing of their retainer agreement with UpRight Law, Mr. Brucker attended a hearing on the Second Lawsuit, paid the entry of appearance fee of $177.00 and was subjected to a judgment in the Second Lawsuit.

148.    During the months from June 29, 2018 until February 28, 2019, UpRight did not provide the Debtors with a check list of documents to gather, did not begin to prepare or review the Petition, did not request that the Debtors save copies of paystubs and bank statements, and, contrary to their promises they would provide immediate legal help, failed to act with appropriate diligence to ensure the Debtors' case was filed in a diligent manner.

149.    Despite speaking with SCC Estes, agreeing to retain UpRight Law, and making not only the initial payment but all of the payments pursuant to the UpRight Law retainer agreement, Debtors did not receive any substantive legal help from UpRight Law or Mr. Buch until nearly eight months later on March 13, 2019.

150.    In this District, after its non-attorney salespersons sign up its clients, as part of its business model, UpRight Law has a pattern or practice of not providing prospective assisted persons and assisted persons with immediate substantive legal help or bankruptcy assistance for

many months, until after the prospective assisted person and assisted persons have paid all attorney's fees and court filing fees in full.

151.    In this District, after its non-attorney salespersons sign up its clients, as part of its business model, UpRight Law intentionally does not provide prospective assisted persons and assisted persons with immediate substantive legal help or bankruptcy assistance for many months, until after the prospective assisted person and assisted persons have paid all attorney's fees and court filing fees in full.

152.    Debtors paid their attorney's fees and court filing fees in full to UpRight Law on February 28, 2019, but their bankruptcy case was not commenced on their behalf until eight months later on October 30, 2019.

153.    From the date of Debtors' retention of UpRight Law on June 29, 2018 through the date when UpRight Law's attorney's fees and the court filing fee were paid in full on February 28, 2019, Mr. Brucker suffered wage garnishment deductions totaling $3,061.70.

154.    From the date when UpRight Law's attorney's fees and the court filing fee were paid in full by Debtors on February 28, 2019 through the date of the commencement of the Bankruptcy Case (October 30, 2019 – 244 after the fees were paid in full and 488 days after Debtors retained UpRight Law), Mr. Brucker suffered wage garnishment deductions totaling $2,766.19.

155.    In total, from the date Debtors retained UpRight Law to fight for them to get them on the path to financial freedom and to immediately start preparing their case, Debtors suffered wage garnishment deductions of $5,827.89, which sum was paid to Prestige on an unsecured, non-priority debt absolutely dischargeable in bankruptcy.

156.    UpRight Law and Mr. Buch failed to advise Debtors of available legal options which would have allowed Debtors to quickly file their petition for bankruptcy relief, including

the option to pay the Court filing fee through installments utilizing Official Form 103A, which would have allowed for the immediate invocation of the automatic stay and the termination of the weekly wage garnishment deduction against Mr. Brucker's wages.

157.    UpRight Law and Mr. Buch failed to properly advise Debtors of the legal option to commence the Bankruptcy Case by filing the Voluntary Petition and the creditor matrix initially with the remaining required schedules within fourteen days thereafter, or such other time as the Bankruptcy Court may have permitted.   Again, this would have allowed for the sooner invocation of the automatic stay and the termination of the weekly wage garnishment deduction against Mr. Brucker's wages.

158.    UpRight Law has a demonstrated history of failing to timely file cases in the Southern District of Illinois, thus demonstrating a pattern or practice of excessively or unnecessarily delayed case filings to the detriment of UpRight Law clients.

159.    UpRight Law has been found by other bankruptcy courts not to timely file cases, thus demonstrating a pattern or practice of excessively delayed case filing.

160.    UpRight Law and its local partner attorneys have filed numerous cases in this District since January 2019 which demonstrate lengthy filing delays from the time UpRight Law was paid in full.

161.    UpRight Law has a clear and consistent pattern or practice of representing to debtors that it can, and will, file a bankruptcy case in this District within a reasonable amount of time, while at the same time having a demonstrated record of failing to do so.

162.    UpRight Law failed to timely file a Chapter 7 Bankruptcy Case in the Southern District of Illinois after the completion of the Debtors' payments.

163.    Any express or implied representation to the Debtors that UpRight Law could, and would, immediately or even timely file a Chapter 7 Bankruptcy Case in the Southern District of

Illinois after the completion of the Debtors' payments was false and misleading, and UpRight Law and Mr. Buch knew of the falsity of such representations at the time they were made, given its history of failing to timely file cases in this district.

164.    UpRight Law and Mr. Buch knew, or reasonably should have known, that Debtors' case would not get filed with the Court immediately after their payment plan was complete, because neither UpRight Law nor Mr. Buch require (or even request) that Debtors provide the necessary documentation and information to complete the schedules and related documents until after the attorney's fees and court costs are paid in full.

WHEREFORE, the Plaintiff prays for a final order and judgement on Count II:

A.  Finding that both Defendants violated 11 U.S.C. § 526(a)(3);

B.  Finding that such violations by UpRight Law were part of clear and consistent pattern or practice or were done intentionally;

C.  Imposing an injunction pursuant to 11 U.S.C. § 526(c)(5)(A) against UpRight Law and barring UpRight Law from engaging in conduct which would violate Section 526(a), including representing to Debtors that it is "efficient" or able to timely file a case or that it will provide immediate legal help; and,

D.  Imposing an appropriate civil penalty pursuant to § 526(c)(5)(B) of the Bankruptcy Code not to exceed $25,000 against UpRight Law and not to exceed $2,500 against Mr. Buch.

## Count III - Disgorgement of Fees Paid Pursuant to 11 U.S.C. § 329(b) and Rule 2017

163.    All of the preceding paragraphs of this Complaint are incorporated herein by reference.

164.    Debtors entered into a written retainer agreement with UpRight Law and Mr. Mueller, and ultimately assigned to Mr. Buch, under which UpRight Law and Mr. Buch agreed to

represent Debtors in their bankruptcy case.   Debtors paid UpRight Law and Mr. Buch together attorney's fees of $1,725.00.

165.   The cover sheet to the Retainer Agreement provided, among other things, that:



**We fight for you.**  Once you sign, we will work tirelessly and fight for *your rights* to get you on the path to financial freedom.

**We start work immediately.** We will start by *immediately* taking your creditor calls and preparing your case. As soon as your payment plan is completed, we will get you filed for bankruptcy.

166.   The Retainer Agreement specifically represents: "***Firm will immediately begin providing Services and accrue billable time. Services include all representation to complete Client's legal matter,*** except Agreement does not include representation in any objection to discharge, adversary proceeding or any heavily contested matter or Services that could not have been contemplated after reasonable diligence by Firm when this Agreement was signed ("Additional Services")." (emphasis added)

167.   Despite the foregoing, Debtors were sued by at least one creditor and subjected to judgment and collection between the time they first engaged UpRight Law and when their Bankruptcy Case was filed.

168.   Mr. Brucker's wages continued to be subject to the Prestige wage garnishment action even after Debtors Retained UpRight Law and until their Bankruptcy Case was filed.

169.   Debtors sought assistance to file a bankruptcy case and contacted Upright Law because they believed UpRight Law's advertisements that it would be able to help them in that regard.

170.   Debtors then were forced to wait 488 days *after* UpRight Law began first providing bankruptcy assistance and eight months *after* having paid UpRight Law in full before UpRight Law finally commenced their Bankruptcy Case.

171.     During this 488 day time period, Debtors were subjected to the Second Lawsuit, paid the State Court entry of appearance fee of $177.00, wasted their time contesting the Second Lawsuit, and, most importantly, needlessly lost thousands of dollars ($5,827.89) through the Prestige wage garnishment proceeding.

172.     Despite ample opportunity to do so, UpRight Law failed to timely provide Debtors with the necessary requirements and documentation that would be required of them in order to complete their bankruptcy paperwork and commence the bankruptcy case within a reasonable time.

173.     When UpRight Law advised Debtors of the documentary requirements to complete their bankruptcy paperwork, UpRight Law erroneously insisted that in order to file their case, it was *absolutely mandatory* that UpRight Law have every pay advice for the six month period ending in the month prior to the filing of the case.

174.     Despite ample opportunity to do so, UpRight Law failed to timely provide Debtors with the legal options available to them to quickly file their bankruptcy case, including the option to pay the court filing fee in installments.  By seeking to pay the filing fee in installments, Prestige's wage garnishment would have immediately ended and Debtors could have then used those wages which would have been garnished to pay the court filing fee in five weeks or less.

175.     UpRight Law knew or should have known at the time of their phone call with Mr. Estes, a non-attorney UpRight Law employee, on June 29, 2018, that Mr. Brucker's wages were being garnished by Prestige and that one option to getting the case filed in a timely manner was for Debtors to seek to pay the court filing fee in installments.

176.     With this knowledge, UpRight Law should have advised Debtors that if it is against UpRight Law's policy of seeking to pay the filing fee through Court approved installments, they might want to consider other lawyers who might be willing to seek a Court Order allowing for the

payment of the filing fee in installments.

177.     With the knowledge of the Prestige wage garnishment proceedings, UpRight Law should have advised on or about June 29, 2018 exactly what documents and information would be required of them in order to immediately file their bankruptcy case upon completion of their payment of UpRight Law's attorney's fees.   This information was not provided by UpRight Law until at or near the date that Debtors paid UpRight Law's attorney's fees and the court filing fee in full.

178.     UpRight Law's delay in the filing of the Bankruptcy Case caused Debtors to have to complete the pre-filing credit counseling class twice, resulting in Debtors having to pay the fee for the class a second time.

179.     Moreover, the total attorney fee Debtors paid to UpRight for legal representation in their bankruptcy case is substantially higher than the average fee charged by Local Attorneys who practice in this District when they are not associated with UpRight Law.

180.     Specifically, the customary rate charged by Mr. Buch when he files a chapter 7 bankruptcy case for clients who are not UpRight Law clients is $1,120.00.

181.     During the time between when Debtors initially retained UpRight Law and when Mr. Buch personally met with the Debtors thirteen days (on March 13, 2019) after they had paid in full UpRight Law's fees, Debtors received little to no legal assistance from UpRight Law lawyers. In fact, the only two calls between Debtors and UpRight Law, in that time period, were handled by non-lawyer staff.   As such, Debtors did not receive any real added value from UpRight Law's services that justifies and makes reasonable its higher fees compared to the $1,120.00 customarily charged by Mr. Buch in non-UpRight Law cases.

182.     Even though this case was clearly not filed in a rush, the information contained in the filing was inaccurate.   Specifically, the Statement of Financial Affairs incorrectly set forth

exactly which creditor it was that was garnishing Mr. Brucker's wages, the Lawsuit information relating to Prestige and the repossession activity of Prestige.   It was Prestige who was garnishing Mr. Brucker's wages and not Ms. Oliver as part of the Second Lawsuit.

183.    All compensation paid by Debtors to UpRight Law for the basic bankruptcy services provided over the many number of months of its retention due to UpRight Law's own apparent disregard and lack of urgency and diligence is unreasonable and excessive. Accordingly, such fees must be disgorged back to the Debtors pursuant to 11 U.S.C. § 329 and Fed.R.Bankr.Proc. 2017.

184.    Under the facts and circumstances of this Bankruptcy Case, including Debtors' loss of $5,827.89 in garnished wages, the retention of any fees by UpRight Law is unreasonable and unconscionable.

185.    As a direct result of UpRight Law's failure to immediately or even timely file Debtors' bankruptcy case, Debtors lost wages through the Prestige wage garnishment proceedings in the amount of $5,827.89.

WHEREFORE, the Plaintiff prays for a final order and judgment on Count III:

A.  Determining that the attorney's fees UpRight Law and Mr. Buch charged the Debtors in this case are excessive and unreasonable;

B.  Determining that retention of any fees in this case by Defendants UpRight Law, LLC and Mr. Buch is unreasonable in this case;

C.  Canceling the Retainer Agreement between Debtors and UpRight Law and Mr. Buch;

D.  Ordering return of all fees to Debtors pursuant to 11 U.S.C. § 329(b) and Rule 2017; and,

E.  For any other and further relief the Court deems just and proper under the circumstances.

Dated:  November 23, 2020

Respectfully Submitted,

NANCY J. GARGULA,
United States Trustee

*/s/ Mark D. Skaggs*

Mark D. Skaggs,
Trial Attorney

Mark D. Skaggs, ARDC No.: 6210087
United States Department of Justice
Office of the United States Trustee
401 Main Street, Suite 1100
Peoria, IL 61602
Phone: (309) 671-7854, ext. 226
Mobile: (202) 495-9571
Email: Mark.D.Skaggs@usdoj.gov