### UNITED STATES BANKRUPTCY COURT FOR THE
### SOUTHERN DISTRICT OF ILLINOIS
### EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JAMIE L. BRUCKER and | ) | |
| ANGELA JANE BRUCKER, | ) | Case No. 19-31474 |
| | ) | Chapter 7 |
| Debtors. | ) | |
| ................................................ | ) | |
| | ) | |
| NANCY J. GARGULA, | ) | |
| United States Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 20-03052 |
| | ) | |
| DEIGHAN LAW, LLC | ) | |
| f/k/a LAW SOLUTIONS CHICAGO LLC, | ) | **ANSWER AND ADDITIONAL DEFENSES** |
| d/b/a UPRIGHT LAW LLC, | ) | |
| | ) | |
| and | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| RONALD ALLAN BUCH, | ) | |
| | ) | |
| Defendants. | ) | |

## I.    RESPONSE TO PLAINTIFF'S ALLEGATIONS

Defendants Deighan Law LLC, d/b/a in Illinois as Upright Law LLC (hereafter referred to as "UpRight Law") and Ronald Allan Buch ("Mr. Buch") (collectively "Defendants") hereby submit this Answer to the Adversary Complaint (Doc. 1) ("Adversary Complaint" or "Complaint"), filed by Nancy Gargula, the United States Trustee for Region 10 ("UST"). To the extent not expressly admitted herein, each and every other allegation contained in the Adversary Complaint is denied, including but not limited to the various Prayers' for relief contained in the Complaint, and all captions contained throughout the Complaint.

## JURISDICTION AND VENUE

1.    This is a complaint in which the U.S. Trustee is seeking compensatory and injunctive relief as well as the imposition of sanctions against Deighan Law LLC, formerly known as Law Solutions Chicago LLC, and doing business as UpRight Law LLC, ("UpRight Law") and Attorney

Ronald A. Buch, who provided legal services to the Chapter 7 Debtors Jamie L. Brucker and Angela Jane Brucker ("Debtors") in case number 19-31474 now pending in the United States Bankruptcy Court for the Southern District of Illinois, East St. Louis Division.

**ANSWER:** Defendants admit Paragraph 1.

2.     The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(b) and a general order of reference from the United States District Court for the Southern District of Illinois.

**ANSWER:** Defendants admit Paragraph 2.

3.     This proceeding is both a constitutionally and statutorily core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O) in that it asserts only claims arising directly under title 11 of the United States Code. Nevertheless, to the extent any of these proceedings are non-core, the U.S. Trustee consents to the entry of a final judgment by the Bankruptcy Court in accordance with the local rules of this Court.

**ANSWER:** Defendants deny that this case is constitutionally or statutorily a core proceeding under 28 U.S.C. §157(b)(2)(A) or (O).  Further stating, Defendants do not consent to the entry of a final judgment by the Bankruptcy Court in this case.

4.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

**ANSWER:** Defendants admit that venue is proper in the U.S. District Court for Southern District of Illinois. However, to the extent that Paragraph 4 is intended to state or imply that the Bankruptcy Court is the proper Court under these circumstances, it is denied.

### Parties

5.     Plaintiff is the duly appointed United States Trustee for Region 10, which includes the Southern District of Illinois.

**ANSWER:** Defendants admit Paragraph 5.

6.     Plaintiff has standing and files this Complaint in her official capacity pursuant to 28 U.S.C. § 586(a) and 11 U.S.C. § 307.

**ANSWER:**  Defendants admit that Plaintiff has filed this Complaint in her official capacity pursuant to 28 U.S.C. § 586(a) and 11 U.S.C. § 307.  Defendants further admit that Plaintiff possesses statutory standing to file this Complaint.  Plaintiffs, however, deny that constitutional standing exists with respect to the UST's allegations relating to a "free consultation," as it does not present a "case or controversy."

7.    Defendant, UpRight Law is an Illinois limited liability company with its principal place of business in Chicago, Illinois.

**ANSWER:** Defendants admit Paragraph 7.

8.    UpRight Law provided legal services to the Debtor in connection with the filing of a Chapter 7 bankruptcy case, docketed as case number 19-31474 (the "Bankruptcy Case").

**ANSWER:** Defendants admit Paragraph 8.

9.    Defendant Ronald A. Buch, a member of the bar of this Court, purports to be a partner of UpRight Law ("Mr. Buch").  Mr. Buch executed and electronically filed the bankruptcy petition, schedules ("Schedules"), and the statement of financial affairs (the "Statement") in this case utilizing the Court's CM/ECF system.

**ANSWER:** Defendants admit Paragraph 9, except to the extent that the UST's use of the word "purport" is intended to suggest that Mr. Buch' affiliation with UpRight Law is not bona fide.

10.    At some point in time in 2018, Mr. Buch purchased and became the owner of the firm formerly owned by William Mueller, the local partner attorney who electronically signed the UpRight Law retainer agreement with Debtors. Subsequently, UpRight re-assigned the Debtors' local attorney referral to Mr. Buch.

**ANSWER:** Defendants admit Paragraph 10, except to the extent that the UST's use of the word "referral" is intended to suggest that Mr. Buch's assignment is not a bone fide activity by a law firm.

11.    Robert E. Eggmann serves as the duly appointed Chapter 7 Trustee (the "Chapter 7 Trustee").

**ANSWER:** Defendants admit that Robert E. Eggmann is the Chapter 7 Trustee of record in the bankruptcy case docketed as case number 19-31474 but lack knowledge sufficient to admit or deny any allegation relating to the circumstances of his appointment.

## Procedural History

12.    Debtor filed her voluntary petition under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") on October 30, 2019 (the "Petition").

**ANSWER:** Defendants admit Debtors' voluntary petition was filed on October 30, 2019.

13.    Mr. Buch signed Debtors' Petition on page 7 as counsel for Debtors. Mr. Buch's signature block on the Petition attests that he was filing this case as an attorney of UpRight Law.

**ANSWER:** Defendants admit Paragraph 13.

## Factual Allegations Relevant to All Counts

### A.    *The Structure and Business Model of UpRight Law*

14.    UpRight Law operates primarily from its main office in Chicago, Illinois.

**ANSWER:** Defendants deny Paragraph 14.

15.    As of June 1, 2015, UpRight Law had three equity members, Kevin Chern, Jason Allen, and David Leibowitz (the "Equity Members").

**ANSWER:**   Defendants admit that on June 1, 2015, UpRight Law had three equity members: Kevin Chern, Jason Allen, and David Leibowitz.  To the extent that paragraph 14 is intended to allege that this constitutes the current equity members of the firm, it is denied.

16.    Between 2015 and his departure from UpRight Law in early 2019, Kevin Chern was the managing partner and the attorney who had supervisory responsibility over the company's attorney and non-attorney staff and local partners.

**ANSWER:** Defendants admit Paragraph 16.

17.     UpRight Law asserts that Mr. Allen ceased his job functions in June 2018 and signed his separation papers on July 18, 2018, while Mr. Chern officially resigned on February 19, 2019.

 **ANSWER:**   Defendants admit that Mr. Allen signed his separation papers on June 18, 2018. Defendants lacks knowledge sufficient to form a belief as to the sufficiency of the allegation as to what "UpRight Law asserts," which is not clarified in paragraph 17.   Defendants deny the remainder of paragraph 17.

18.     Michael Deighan a/k/a Mike Deighan is now the majority equity member of UpRight Law, and in and around May of 2019, the firm changed its legal name to Deighan Law LLC. Following Mr. Chern's departure from UpRight Law, Mr. Deighan became and is now the managing partner and attorney who has supervisory authority over the company's attorney and non-attorney staff and local partners. Online records for the State Bar of Michigan indicate that Mr. Deighan is licensed to practice in Michigan, while the online records of the Illinois Attorney Registration & Disciplinary Commission indicate that Mr. Deighan is not licensed to practice law in Illinois.

 **ANSWER:** Defendants admit Paragraph 18.

19.     UpRight     Law's     advertising,     including     its     website,     found     at https://www.uprightlaw.com/, states that UpRight Law is a debt relief agency and that it "help[s] people file for relief under the Bankruptcy Code."

 **ANSWER:** Defendants admit Paragraph 19.

20.     Prior to his departure from UpRight Law and Mike Deighan's succession as equity owner and Managing Partner, UpRight Law's website named Mr. Chern as the attorney responsible for the content of the site. UpRight Law's website currently provides that "An attorney responsible for the content of this site is Mike Deighan, Esq., licensed in Michigan with an office

at 79 West Monroe Street, 5th Floor, Chicago, Illinois 60603." The website further directs prospective assisted persons who view it to click a link "To see the attorney in your area who is responsible for this advertisement."

  **ANSWER:** The first two sentences of Paragraph 20 are admitted. Defendant further admit that the website contains a link that permits any visitor to the website to click hyperlink that enables the visitor to see who in that visitor's area is responsible for the advertisement. Defendants deny the remainder of Paragraph 20.

21.     Below statements such as "We bring the law office to the living room," "Do you qualify for bankruptcy protection," "Get immediate access to legal help on your terms," and "Have 10 minutes? Get your bankruptcy questions answered here," UpRight Law's website advertises, among other things, that it provides a "free consultation" and represents that:

> "At UpRight Law, every day we look for ways to *Make Clients Love Us* and to *Find a Better Way*! By providing immediate legal help to people with limited means, even when they cannot afford to pay for legal services today, we advance these values. When we say, "get started for free," we mean it. Every day, UpRight Law starts providing debt relief assistance to dozens of clients even before they have paid us any money. We do ask that they make a commitment to pay something by scheduling a future payment, but we are committed to providing assistance now and placing our clients' immediate need for help first."

Available at www.uprightlaw.com (last accessed September 7, 2020).

  **ANSWER:** Defendants state that Paragraph 21 is unintelligible, and that Defendants therefore lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21.

22.     UpRight Law's advertising asserts that it is committed to "Increasing Efficiency delivering fair and just outcomes effectively, without waste or duplication."

  **ANSWER:**   Defendants admit that this statement appears on its website, and that its website constitutes a form of advertising.  Defendants deny the remainder of paragraph 22.

23.     UpRight Law commences cases in bankruptcy courts throughout the United States,

including in this Court, through its affiliations with locally licensed attorneys.

**ANSWER:**  Defendants deny Paragraph 23 and note that UpRight Law has never filed for bankruptcy.

24.     UpRight Law refers to its local attorneys (hereinafter, "Local Attorneys") as "limited partners" and/or "partner attorneys" based on the execution of a "Partnership Agreement."

**ANSWER:**  Defendants admit that UpRight Law refers to the majority of its affiliated attorneys as "limited partners" or "partner attorneys."  Defendants further admit that these attorneys execute a Partnership Agreement with the firm.  Defendants deny the remainder of paragraph 24, including the suggestion that all partners have signed an identical partnership agreement.  Defendants further deny that these are the only titles used by attorneys who file cases as attorneys for UpRight Law.

25.     The Partnership Agreement provides for the division of fees between UpRight Law and the Local Attorney on a case by case basis based on the completion of certain tasks by the Local Attorney in a chapter 7 or a chapter 13 case.

**ANSWER:**  Defendants lack knowledge or information as to the particular agreement to which the Complaint refers in Paragraph 25.  Defendants further state that the agreement that governed the relationship between Upright Law and Mr. Buch throughout the Debtor's bankruptcy was the June 26, 2018 partnership agreement between them.  Defendants admit that this agreement addresses, *inter alia*, the manner in which attorney fees would be allocated between UpRight Law and Mr. Buch for Chapter 7 and Chapter 13 representations.

26.     The Partnership Agreement also provides for the distribution of 1% of the profits generated in each jurisdiction to the Local Attorneys in that jurisdiction on a yearly basis.

**ANSWER:**  Defendants lack knowledge or information as to the particular agreement to which the Complaint refers in Paragraph 26.  Defendants admit that the June 26, 2018 partnership agreement between Ronald Buch and UpRight Law provides for the distribution of 1% of the profits generated

in each jurisdiction to the Local Attorneys in that jurisdiction on a yearly basis.

27.    In chapter 7 cases, the Local Attorneys now receive up to thirty-three percent of the fees paid to UpRight Law. The Local Attorney is responsible for all document collection and review and the preparation of the petition and schedules, with the exception of basic information – such as the debtors' address, the part of the statements of financial affairs concerning UpRight Law's compensation, and the preparation of the required Rule 2016 disclosures – which are all prepared by employees in UpRight Law's Chicago office.

**ANSWER:**  Defendants admit that the Local Attorneys are ultimately responsible for the final "document collection and [*sic*] review and the preparation of the petition and schedules." Defendants deny the remainder of Paragraph 27.

28.    Mr. Buch signed Partnership Agreement with UpRight Law on June 26, 2018.

**ANSWER:** Defendants admit Paragraph 28.

29.    Under this agreement, Mr. Buch receives 33% of the fees paid to UpRight Law by the clients whom UpRight Law refers to him if their cases are filed and the clients receive a discharge.

**ANSWER:**  Defendants deny Paragraph 29 as it is written, but admit that under certain circumstances, the Partnership Agreement does provide for a payment to Mr. Buch of 33% of the attorneys' fees.

30.    Thus, UpRight Law retains approximately 67% of the fees in each chapter 7 case for providing an initial "consultation" with a non-attorney salesperson, preparing and obtaining a signed retainer agreement, managing the debtors' payments, and completing a small portion of the required petition, the statement of financial affairs question regarding payment of fees for bankruptcy services, and the Rule 2016 disclosure to be filed with the court.

**ANSWER:** Defendants deny Paragraph 30.

31.    UpRight Law calls its non-attorney salespersons "consultants." A consultation, however, is the act of asking the advice or opinion of someone professionally qualified (such as a

lawyer) to get their advice. UpRight Law entices vulnerable consumers to contact it to get "immediate. . . legal help" and get their "bankruptcy questions answered" and be told if they "qualify for bankruptcy protection." But UpRight Law intentionally and systematically offers a "free consultation" it has no intention of providing. Rather, prospective assisted persons and prospective debtors that contact UpRight Law are misled about such free consultations as they are subjected to a sales pitch from, primarily, non-attorney salespersons referred to by UpRight Law as "Senior Client Consultants." Generally, prospective assisted persons or prospective debtors are not placed into contact with an attorney unless and until they agree to a "verbal retainer" and either make a payment to UpRight Law or set up an electronic draft for a payment if they are not able to make an immediate payment. Then, UpRight Law's standard practice is to charge such clients for all time thereafter including the first communication such client has with any attorney, let alone the attorney that would be responsible for providing legal services to the client.

**ANSWER:** Defendants deny Paragraph 31.

32.     The Debtors did not receive a free consultation with an attorney.

**ANSWER:** Defendants deny Paragraph 32.

33.     The Debtors paid two-thirds of their attorney fee to UpRight Law for largely non-legal, **non-compensable** services and, in reality, only one-third of their attorney fee went to the person providing actual legal services.

**ANSWER:** Defendants deny Paragraph 33.

34.     The pattern or practice of UpRight Law since its inception is to perform the debtors' initial "consultation" using primarily *non-attorney* staff employed in UpRight Law's Chicago office.

**ANSWER:** Defendants admit that the initial consultation are generally (but not exclusively) performed by non-attorney staff employed by UpRight Law's Chicago office. Defendants deny the remainder of Paragraph 34.

35.     UpRight Law considers the activities of its "consultants" to be part of its "sale

operations" and it has in the past trained its "consultants" to engage in high-pressure tactics and otherwise economically incentivized such employees to "close" sales, which practices and policies led to "consultants" engaging in the unauthorized practice of law. Upon information and belief, UpRight Law continues to tie part of "consultants" compensation to fees collected.

**ANSWER:** Defendants deny the first sentence of Paragraph 35. Defendants admit the second sentence of Paragraph 35 to the extent that part of the compensation for the intake staff is potentially related to the overall amount of fees collected by firm. Defendants deny the remainder of Paragraph 35.

36.    Thus, the pattern or practice of UpRight Law is for debtors' first ~~substantive~~ contact with UpRight Law to be with a "consultant" who is frequently a non-attorney. The non-attorney "consultants" are, essentially, telemarketers who are paid bonuses based at least in part upon the "sales" they make to prospective assisted persons and assisted persons. Part of the salespersons' compensation package is based upon the amount of fees paid by the client within the first 30 days of the date of contact with UpRight Law.

**ANSWER:** Defendants admit that compensation levels of certain of its intake staff may be affected by the amount of fees collected from firm clients. The remainder of Paragraph 36 is denied.

37.    Thus, the salespersons have an incentive to sign-up new prospective assisted persons to file a bankruptcy case, regardless of the circumstances, regardless of whether the prospective assisted person is a good candidate for a bankruptcy case, and regardless of whether the prospective assisted person might be better advised not to file a bankruptcy case at all.

**ANSWER:** Defendants deny Paragraph 37.

38.    In 2018, during the time the Debtors were making payments to UpRight Law, UpRight Law's gross sales and receipts were $28,683,556.

**ANSWER:** Defendants deny Paragraph 38.

39.    UpRight Law non-attorney salespersons then provide the debtor information about the

debtor's bankruptcy and non-bankruptcy options, including information as to the nature of the relief

under each chapter of the Bankruptcy Code.

   **ANSWER:**   Defendants admit that during an initial consultation with a prospective client, the

Senior Client Consultant typically provides objective information about potential bankruptcy and

non-bankruptcy, including information about the differences between Chapter 7 and Chapter 13

bankruptcies.   The remainder of Paragraph 39 is denied.

   40.    There is evidence, as found by other bankruptcy courts, including the Western District

of Virginia in *In re Williams,* 2018 WL 832894 (February 12, 2018), the Western District of Louisiana

in *In re Banks,* 2018 WL 735351(February 6, 2018), *aff'd, Law Solutions Chicago LLC v. United

States Trustee,* 592 B.R. 624 (W.D. La. 2018), *aff'd* 770 Fed. Appx. 168 (5th Cir. 2019), and the

District of South Carolina in *In re Walker,* 604 B.R. 10 (D.S.C. 2019), that UpRight Law's non-

attorney "consultants" often provide legal advice to potential clients, who are prospective assisted

persons, including exemption information and information about which chapter of bankruptcy best

suits their needs.

   **ANSWER:** Defendants deny Paragraph 40.

   41.    A majority of UpRight Law's clients are assisted persons as that term is defined in the

Bankruptcy Code. Under UpRight Law's standard operating practices, the non-attorney "consultant"

and potential client, who is often a prospective assisted person as defined under the Bankruptcy Code,

agree on a bankruptcy option, without attorney input, and the "consultant" then establishes an agreed

plan for the payment of the attorney's fees in the case. This has resulted in an installment payment

plan lasting on average between four and eight months, or even longer, in numerous cases that remain

pending before this Court.

   **ANSWER:** Defendants state that the first sentence of this Paragraph calls for a legal conclusion.

To the extent an answer is required, that first sentence is denied. Defendants admit that the Senior

Client Consultant often agrees on a plan with prospective clients under which the client will pay his

or her fees in installments, which is subject to change. Defendants deny the remainder of Paragraph 41.

42.     After the non-attorney "consultant" reaches a payment agreement with the prospective assisted person, the "consultant" reads the prospective assisted person a "verbal retainer" which sets forth the purported conditions of the representation.

**ANSWER:** Defendants admit that firm's intake staff, which is comprised mostly of non-attorneys, typically read a verbal disclosure to the firm's client after the client has expressed interest in engaging the firm, which relates to certain aspects of the firm's representation of the client. Defendants deny the remainder of Paragraph 42 to the extent that it is intended to imply that all UpRight Law's intake staff is comprised on non-attorneys, or that its non-attorneys are not subject to direct supervision of attorneys.

43.     Before the prospective assisted person ever speaks with an attorney, the non- attorney "consultant" takes the prospective assisted person's bank information and obtains permission from the prospective assisted person to take an initial ACH payment to UpRight Law. The "verbal retainer" does not provide the complete terms of the assisted person's engagement agreement with UpRight Law, such that, assisted persons make their initial payment and agree to ACH debits for attorney's fees to UpRight Law based on an incomplete understanding of the terms and scope of UpRight Law's representation.

**ANSWER:** Defendants admit that there are times in which a new firm client will provide his or her relevant debit card information authorization for the firm to make an initial ACH debit before that client has spoken to an attorney. Defendants further admit that the verbal disclosure does not provide the complete terms of the representation, which are reflected in the retention agreement. Defendants lack knowledge or information sufficient to admit or deny allegations relating to the "understanding" of its clients. Defendants deny the remainder of paragraph 43, including: (a) any implication that the debit cards of the firm's clients are always charged before they have spoken

with an attorney; (b) that the provision of debit card information is the equivalent of charging the

client's debit card; and (c) that the verbal disclosures are the sole source of information relating to

the terms of the representation.

44.     UpRight Law then sends the prospective assisted person a written retainer agreement

under the signature of the Local Attorney.

**ANSWER:** Defendants admit that the firm's standard procedure is to send its clients a written

retainer agreement within five business days, to which the electronic signature of the Local Partner

is affixed, and which is subject to certain terms and conditions in the agreement. Defendants lack

information sufficient to form a belief about the truth of the allegations in the context of this abstract

hypothetical as to whether that person would constitute a "prospective assisted person." Defendants

deny the remainder of paragraph 44.

45.     Under their agreements with UpRight Law, the Local Attorneys, including Mr.

Buch, delegate signature authority to UpRight Law for the purpose of affixing the Local Attorney's

signature on the retainer agreements provided to prospective assisted persons. UpRight Law's

standard practice is to permit the non-attorney "consultants" or staff attorneys who are not the Local

Attorney assigned to represent the prospective assisted persons to affix the Local Attorney's signature

to the retainer agreement provided to prospective assisted persons. Accordingly, in the vast majority

of cases, the Local Attorney whose signature appears on the retainer agreement has no knowledge of

the existence of this new client, has not reviewed or approved the sending of the retainer agreement

in each specific case, has not reviewed the proposed attorneys' fees for reasonability and, has not

had a chance to check for conflicts prior to the execution of the retainer agreement on his or her

behalf.

**ANSWER:** Defendants admit that the Partnership Agreement between Mr. Buch and UpRight

Law authorizes the firm to affix the digital signature of Mr. Buch for purposes of issuing the

retention agreement. Defendants lack information sufficient to admit or deny the third sentence of

Paragraph 45. Defendants deny the remainder of Paragraph 45, including the implication that Paragraph 45 contains a complete recitation of the relevant provisions in Mr. Buch' Partnership Agreement relating to the affixation of Mr. Buch' signature, as well as the suggestion that the intake staff prepared and sends retention agreements to the client.

46.     According to UpRight Law's practices, the Local Attorney to whom the case is being assigned is then sent an email, or other electronic communication, instructing the Local Attorney to contact the client with a brief phone call, which UpRight Law calls a "compliance call." The compliance call provides the misleading impression that an actual attorney will immediately begin providing substantive legal services to the assisted person.

**ANSWER:** Defendants admit that the firm's standard practice is to have the attorney assigned to the new client speak with the client shortly after the client has engaged the firm, and that UpRight Law refers to this as a "Compliance Call."  Defendants further admit that the method of notifying the attorney that he or she has been assigned a new client is by way of e-mail.  Defendants deny the remainder of paragraph 46.

47.     With the exception of the compliance call and responding to creditor inquiries concerning its retention, UpRight Law generally maintains the pattern or practice of performing only administrative and clerical work on the clients' matter, and withholding performance of any legal work to prepare the clients' bankruptcy case for filing, including the collection or the review of any documentation, until after the clients have paid their fees through any installment payment plan in full and the case is handed off to the local attorney.

**ANSWER:** Defendants deny Paragraph 47.

48.     Thus, although UpRight Law maintains it is a proper law firm by virtue of its paper agreements with local attorneys, in reality, UpRight Law's organizational practice of providing prospective assisted persons and assisted persons with intake "consultations" with telemarketers and only handing off their cases for legal representation to Local Attorneys after cases are paid in

14

full creates a system of practice that is more like a referral service than a law firm.

**ANSWER:** Defendants admit that UpRight Law is a proper law firm. Defendants deny the remainder of Paragraph 48.

49. Typically, neither UpRight Law's Chicago office nor its Local Attorney send debtors document requests or otherwise begin preparing a case for filing until *after* the fees are paid in full.

**ANSWER:** Defendants deny Paragraph 49.

50. UpRight Law's practice of accepting fees on an extended installment plan and not even beginning the process of preparing any of the documents prior to full payment contributes to lengthy delays between UpRight Law's retention by a debtor and the filing of the case which far exceed the typical retention-to-filing timeline in other cases with counsel in the Southern District of Illinois who are not associated with UpRight law.

**ANSWER:** Defendants lack knowledge or information sufficient to enable it to admit or deny allegations relating to what is, or what the UST believes to be, "the typical retention-to-filing timeline in other cases with counsel in the Southern District of Illinois who are not associated with UpRight Law." To the extent a further response is required, Defendants deny paragraph 50.

51. As a result, it may take from nine months to a year, or even longer, from the date debtors make their first payment and retain UpRight Law before their chapter 7 case is finally commenced (if at all) in this District. For fifty (50) cases currently under review before this Court, the average length of time from the date of the first payment to UpRight Law to the date of the filing of the case is three hundred eighty-eight (388) days, or just over one year.

**ANSWER:** Defendants admit that there are cases in which the amount of time that has elapsed between the time that a client engages the firm and the time that he or she files for bankruptcy under Chapter 7 is nine months or longer. Defendants lack information sufficient to admit or deny the remainder of this paragraph given the UST has not specified the 50 cases that are currently under review that she used in her calculation.

52.      UpRight Law has a demonstrated history of significant filing delays in the Southern District of Illinois from the date of the payment in full of UpRight Law's attorney's fees and the court filing fee. For the fifty (50) cases currently under review before this Court, the average length of time from the date of payment in full of UpRight Law's attorney's fees and court filing fee to the date of the filing of the case is one hundred sixty-nine (169) days, or almost six months.

**ANSWER:**  Defendants deny the first sentence of Paragraph 52. Defendants lack information sufficient to admit or deny the remainder of this paragraph given the UST has not specified the 50 cases that are currently under review that she used in her calculation.

53.      Although UpRight Law advertises "immediate legal help" to prospective assisted persons, UpRight Law does not provide immediate legal help to prospective assisted persons and assisted persons until after UpRight Law has received payment in full of attorney's fees and court filing fee.

**ANSWER:**  Defendants deny Paragraph 53.

54.      Thus, UpRight Law's attorney referral operation is made apparent by its pattern and practice of failing to provide any substantive legal help to prospective assisted persons and assisted persons until the cases are paid in full and handed off to the local attorney for actual legal review and filing.

**ANSWER:**  Defendants deny Paragraph 54.

55.      However, to the extent UpRight Law attempts to operate as a national law firm, its managing partners, previously Mr. Chern and now Mr. Deighan, fail to adequately supervise UpRight Law's non-attorney staff and its Local Attorneys, to the detriment of the prospective assisted persons and assisted persons who are persuaded by UpRight Law's advertising and sales pitches to retain UpRight Law for bankruptcy assistance services.

**ANSWER:**  Defendants deny Paragraph 55.

56.      UpRight Law's pattern or practice of failing to immediately provide any substantive

16

legal help to prospective assisted persons and assisted persons often results in such prospective assisted persons and assisted persons being subjected to lawsuits, judgments, and garnishments during the period after UpRight Law's retention and the ultimate filing of contracted for bankruptcy case in the Southern District of Illinois.

**ANSWER:**  Defendants deny Paragraph 56.

### B. Facts Related to the Brucker Case

57.   Debtors are husband and wife with Mr. Brucker having one child for whom he pays child support.

**ANSWER:**  Defendants admit Paragraph 57.

58.   At all relevant times herein, Mr. Brucker was employed with Prairie Farms Dairy, Inc., and was paid $21.54 per hour and consistently worked a 40-hour week resulting in weekly gross earnings of $861.60.

**ANSWER:**  Defendants admit that Mr. Brucker was paid $21.54 hourly and he usually worked a 40-hour week but he has occasional overtime and he has a 36-hour week.

59.   At all relevant times herein, Mrs. Brucker received social security income at the rate of $1,153.00 per month.

**ANSWER:**   Defendants admit that Mrs. Brucker received $1153.00 in 2019 but prior to 2019 it was 1150.00.

60.   On June 15, 2017, Prestige Financial Services, Inc. ("Prestige"), a creditor of Mr. Brucker, commenced a lawsuit against Mr. Brucker in the Circuit Court of St. Louis County, Missouri, Associated Circuit Division, as case number 17SL-AC15 Mr130 ("Lawsuit"), seeking to collect on a deficiency balance owed on a loan secured by a 2010 Nissan Cube automobile that Prestige had repossessed and sold with the proceeds from the sale being insufficient to pay-off the loan balance.

**ANSWER:**  Defendants admit only the first three lines of Paragraph 60 as to the existence of the

Lawsuit.  Defendants lack sufficient information to admit or deny the remainder of this paragraph.

61.    On July 25, 2017, Prestige obtained a judgment in the Lawsuit in its favor and against Mr. Brucker in the total amount of $13,088.78 plus court costs, with post-judgment interest accruing at the contract rate.

**ANSWER:**  Defendants admit only that a Judgment in the Lawsuit, for $13,088.78, was signed on July 26, 2017 and yet was filed the day before, on July 25, 2017.

62.    On August 16, 2017, Prestige commenced wage garnishment proceedings within the Lawsuit against Mr. Brucker's wages at Prairie Farms Dairy, Inc.

**ANSWER:**  Defendants admit only that the docket for the Lawsuit reflects activity regarding garnishment on August 16, 2017.

63.    From the date of commencement of the wage garnishment proceedings and through the date Debtors retained UpRight Law, as more fully discussed below, Prestige received a total of $3,005.73 through the wage garnishment proceedings (2017: $1,165.57 + 2018 through 06/29/2018: $1,840.16).

**ANSWER:**  Defendants deny any implication that they are responsible for any garnishments. Defendants lack information sufficient to admit or deny the remainder of Paragraph 63.

64.    Debtors first contacted UpRight Law on June 29, 2018, after having performed a search on the Internet, which resulted in UpRight Law appearing as one of the first few results.

**ANSWER:**  Defendants admit Paragraph 64.

65.    Debtors then clicked on the UpRight Law website and reviewed the materials contained therein.

**ANSWER:**  Defendants are unable to admit or deny this allegation  due to the lack of specificity of timing.

66.    Also on June 29, 2018, Debtors called UpRight Law and spoke with Chicago-based UpRight Law employee, non-attorney salesperson Pierre Estes ("Mr. Estes") ("First Call").

**ANSWER:** Defendants admit Paragraph 66.

67. Debtors' communication with Mr. Estes during the First Call convinced Debtors to file bankruptcy, to file a petition under chapter 7 and not chapter 13, to utilize the services of UpRight Law to file their bankruptcy case, and that they would pay UpRight Law the quoted sum of $1,725.00 in attorney's fees plus the court filing fee of $335.00 to accomplish their filing. Debtors were also required to pay the costs of the pre-filing credit counseling and post-filing financial management course on their own and in addition to the attorney's fees and court filing fee.

**ANSWER:** Defendants admit only that Mr. Estes quoted a $1,725.00 attorney fee for representation in a Chapter 7 bankruptcy, and a filing fee of $335.00, and the second sentence of Paragraph 67. Defendants are unable to admit or deny Paragraph 67 to the extent it calls for Defendants to speculate about Debtor's state of mind. Defendants deny the remainder of this paragraph.

68. Debtors' attorney's fees to UpRight Law are significantly higher than those typically charged by UpRight Law Local Attorneys in the Southern District of Illinois than when the Local Attorney files a case under his own name and not under the UpRight Law name.

**ANSWER:** Defendants admit that the fees may be higher but deny that fees are "significantly higher".

69. During Debtors' First Call with Mr. Estes, Debtors provided their debit card information in order to make monthly payments to UpRight Law for its attorney's fees and the payment of the court filing fee.

**ANSWER:** Defendants admit Paragraph 69.

70. On July 6, 2018, Debtors debit card was charged an initial down payment of $200.00 to UpRight Law for its attorney's fees. Thereafter, Debtors made monthly payments of $200.00 on the 4th, 5th or 6th of each month thereafter until February 2019, when Debtors made an additional payment of $460.00 on February 28, 2019, resulting in UpRight Law's attorney's fees and

the court filing fee of $335.00 being paid in full.

  **ANSWER:**  Defendants admit Paragraph 70.

71.     At the time of Debtors' First Call with Mr. Estes on June 29, 2018, Mr. Brucker's wages from his employment with Prairie Farms Dairy, Inc., continued to be subject to the Prestige wage garnishment proceeding.

  **ANSWER:**  Defendants admit Paragraph 71.

72.     On June 29, 2018, Debtors signed a Retainer Agreement with UpRight Law, a copy of which is attached hereto as Exhibit 1 ("Retainer Agreement").

  **ANSWER:**  Defendants admit only that the retention agreement is attached as Exhibit 1. Defendants deny the remainder of Paragraph 72 because Debtors signed on 6/30/2018 not 6/29/2018.

73.     The Retainer Agreement consists of ten (10) pages and was emailed by UpRight Law to Debtors on June 29, 2018 at approximately 12:57 p.m. as a package of documents to be read, reviewed, and then signed by the Debtors.  The signed Retainer Agreement was then sent to UpRight Law.

  **ANSWER:**  Defendants deny the retention agreement consists of ten pages.  Defendants admit the remainder of Paragraph 73.

74.     As of the moment Debtors signed the Retainer Agreement, they had not spoken with an attorney from UpRight Law concerning the representation and the issues concerning the bankruptcy filing.

  **ANSWER:**  Defendants admit Paragraph 74.

75.     Four days *after* first speaking with Mr. Estes, on July 3, 2018, a date on which the Prestige wage garnishment proceeding against Mr. Brucker's wages remained in effect and was continuing to result in the loss of earned wages, Debtors received a phone call from Mr. Mueller wherein Mr. Mueller appears to have discussed with Debtors, their financial condition, which would presumably include a discussion of the Prestige wage garnishment proceeding and the available

options to terminate the wage garnishment proceeding as quickly as possible, and then "approved the case."

  **ANSWER:**  Defendants admit the first four lines of Paragraph 75, and that Mr. Mueller approved the case for intake.  Defendants are without information sufficient to admit or deny the remainder of Paragraph 75.

76.    On June 29, 2018, four days *before* speaking with Mr. Mueller, Debtors signed a Retainer Agreement with UpRight Law. A copy of the Retainer Agreement is attached hereto as Exhibit 1 ("Retainer Agreement").

  **ANSWER:**  Defendants admit Exhibit 1 is the retention agreement entered with the Debtors. Defendants deny the remainder of Paragraph 76 because Debtors signed on June 30, 2018.

77.    Over the course of the next eight months, Debtors made their installment payments to UpRight Law for the fees and costs associated with her bankruptcy filing so that, as soon as their payment plan was completed, UpRight Law would file their bankruptcy case as represented by UpRight Law in the second bullet point on page 1 of the Retainer Agreement.

  **ANSWER:**  Defendants admit that the Debtors made their installment payments to UpRight Law for the fees and costs associated with her bankruptcy filing.  Defendants deny the remainder of Paragraph 77.

78.    On October 1, 2018, three months after Debtors had retained UpRight Law, one of Debtors' creditors, Kathy Oliver, filed a lawsuit in St. Clair County Circuit Court identified as case number 2018-SC-3021 against Mr. Brucker relating to alleged damages and losses in connection with a residential lease agreement ("Second Lawsuit").

  **ANSWER:**  Defendants admit only the first two and a half lines of Paragraph 60 as to the existence of the Second Lawsuit.  Defendants lack sufficient information to admit or deny the remainder of this paragraph.

79.    Mr. Brucker was served with the Second Lawsuit on October 2, 2018 advising Mr.

Brucker to appear in St. Clair County Circuit Court, in Belleville, Illinois on November 19, 2018 if he wanted to contest the merits of the Second Lawsuit.

  **ANSWER:**  Defendants lack sufficient information to admit or deny this paragraph.

80.    Despite having signed a Retainer Agreement with UpRight Law, having by then paid $1,000.00 to UpRight Law for its attorney's fees and allegedly having spoken with Mr. Mueller concerning their financial situation, Mr. Brucker appeared unrepresented for the first- appearance court hearing in St. Clair County Circuit Court on November 19, 2018 to respond to the Second Lawsuit.

  **ANSWER:**   Defendants admit only that they did not appear at a November 19, 2018 hearing in a matter (the Second Lawsuit) on which they were not engaged, that Mr. Brucker signed a retention agreement with Defendants for bankruptcy representation, that Mr. Mueller spoke with Mr. Brucker concerning financial situation, and that Mr. Brucker paid money to UpRight Law for representation.  Defendants deny the remainder of Paragraph 80.

81.    In order to appear and be heard on the merits by the Court in the Second Lawsuit, Mr. Brucker was required to pay an entry of appearance fee in the amount of $177.00 to the St. Clair County Circuit Clerk. Mr. Brucker paid the required entry of appearance fee in the Second Lawsuit on November 19, 2018, at a time when the Prestige wage garnishment proceeding continued on a weekly basis to deduct money from his paycheck.

  **ANSWER:**  Defendants lack knowledge sufficient to admit or deny Paragraph 81, including because Debtors thought the fee was waived and they could not remember paying the fee.

82.    Had Mr. Brucker not paid the entry of appearance fee of $177.00 and instead applied that money toward the UpRight Law attorney's fees, Debtors would have then paid the sum of $1,177.00 in UpRight Law attorney's fees, an amount which is greater than the regular fee charged by Mr. Buch when he files cases under his own name rather than as a partner of UpRight Law.

  **ANSWER:**  Defendants admit only that in some cases filed through his own practice Mr. Buch

charges less than fees charged in some UpRight Law cases.  Defendants lack knowledge sufficient to admit or deny the remainder of Paragraph 82, including because Debtors thought the fee was waived and they could not remember paying the fee.

83.     On January 14, 2019, a trial on the merits was held in the Second Lawsuit with the St. Clair County Circuit Court ruling in favor of Ms. Oliver on her complaint and against Mr. Brucker on his counterclaim resulting in a judgment against Mr. Brucker in the amount  of $1,826.99, inclusive of costs.

  **ANSWER**:  Defendants admit to Paragraph 83.

84.     Thereafter, on January 28, 2019, Ms. Oliver filed post-judgment actions to implement her own wage garnishment against Mr. Brucker's wages earned from Prairie Farms Dairy, Inc.  This civil process included the service of the wage garnishment filing being served on Mr. Brucker's employer.

  **ANSWER**:  Defendants admit Paragraph 84.

85.     On or about February 11, 2019, Mr. Brucker's employer responded to the wage garnishment interrogatories required to be completed by the employer indicating that the wage garnishment withholding formula resulted in a negative number such that Ms. Oliver would not receive any funds pursuant to her attempted wage garnishment action.

  **ANSWER**:  Defendants admit Paragraph 85.

86.     A copy of the wage garnishment interrogatories was sent via U.S. Mail to Mr. Brucker.

  **ANSWER**:  Defendants admit Paragraph 86.

87.     On February 12, 2019, one of the Debtors called UpRight Law to discuss the wage garnishment proceeding taken by Ms. Oliver in the Second Lawsuit. Upright Law [sic] Marty Labelle, who is not an attorney, spoke with Debtors for a period of less than 6 minutes concerning the wage garnishment proceedings filed in the Second Lawsuit.

**ANSWER:**    Defendants lack knowledge sufficient to admit or deny whether the phone call definitively was less than six minutes.  Defendants admit the remainder of Paragraph 87.

88.    During the eight-month period after Debtors' retention of UpRight Law and the date UpRight Law's attorney's fees and the court filing fee were paid in full (06/29/2018 – 02/28/2019), other than the brief welcome call from Mr. Mueller, UpRight Law's Local Attorney who was to represent Debtors in their case had no contact with Debtors.

**ANSWER:**  Defendants deny the phone call with Mr. Mueller was brief, and they lack knowledge sufficient to admit or deny the remainder of Paragraph 88.

89.    Debtors made their last payment of attorney's fees and court filing fee costs to UpRight Law on February 28, 2019.

**ANSWER:**  Defendants admit to Paragraph 89.

90.    Mr. Buch was notified the next day that Debtors had paid their attorney's fees and costs in full and the file was handed-off to Mr. Buch.

**ANSWER:**  Defendants admit to Paragraph 90.

91.    On March 1, 2019, after the UpRight Law attorney's fees and costs had been paid in full, Mr. Buch had a telephone conversation with the Debtors lasting less than 12 minutes (his first conversation with the Debtors) concerning the documents UpRight Law asserted they needed to complete Debtors' bankruptcy filing. This was Mr. Buch's first call with Debtors.

**ANSWER:**    Defendants lack knowledge sufficient to admit or deny whether the phone call definitively was less than twelve minutes.  Defendants admit the remainder of Paragraph 91.

92.    On March 13, 2019, when Mr. Brucker's wages had been garnished in the amount of $3,130.18 since the date UpRight Law's retention (6/29/2018), Debtors had their first face-to- face meeting with an UpRight Law attorney, Mr. Buch, concerning their bankruptcy filing. At that appointment, Mr. Buch discussed, for the first time, the specific documents necessary to prepare and complete their bankruptcy filing.

**ANSWER:**  Defendants admit only that on March 13, 2019, Debtors had their first face-to- face meeting with an UpRight Law attorney, Mr. Buch, concerning their bankruptcy filing.  Defendants lack knowledge sufficient to admit or deny the precise amount of garnishment as of that date, and they deny the remainder of Paragraph 92.

93.    Debtors' income information was also provided to UpRight Law during Mr. Buch's March 12, 2019 meeting with Debtors.

**ANSWER:**  Defendants admit only that Debtors provided certain income information to Mr. Buch during a March 12, 2019 meeting, and deny the remainder of Paragraph 93, including that the information provided by the Debtors was accurate or complete.

94.    Shortly thereafter, Debtors completed their pre-filing credit counseling class.

**ANSWER:**  Defendants admit only that Debtors took a pre-filing credit counseling course in or about March 2018.

95.    Because Debtors' Bankruptcy Case was not filed until October 30, 2019, more than one hundred and eighty-days after Debtors completed their pre-filing credit counseling class, Debtors were required to and did attend and pay for a second pre-filing credit counseling class.

**ANSWER:**  Defendants admit only that Debtors attended and paid for a second pre-filing credit counseling course more than one hundred and eighty-days after Debtors completed their first pre-filing credit counseling class

96.    On March 15, 2019, as requested by Mr. Buch, Debtors paid the costs for obtaining their credit reports despite UpRight Law's representation that the attorney's fees and costs included their credit reports. Also at that time, Debtors provided UpRight Law with the name of the recipient of the domestic support obligation paid by Mr. Brucker.

**ANSWER:**  Defendants admit only that on March 15, 2019, as requested by Mr. Buch, Debtors paid the costs for obtaining their credit reports and provided UpRight Law with the name of the recipient of the domestic support obligation paid by Mr. Brucker.  Defendants deny the remainder of Paragraph

96.  Further stating, the credit report cost was refunded to the Debtors..

97.     Nevertheless, despite the weekly wage garnishment being deducted from Mr. Brucker's wages, UpRight Law continued to instruct the Debtors that it was *absolutely mandatory* that before the Bankruptcy Case could be filed, Debtors must provide UpRight Law with every pay advice for the six-month period prior to the filing of the case.

  **ANSWER:**  Defendants admit only that wages were being garnished and that a complete and fresh set of pay advices for the six-month period prior to the filing of the case were sought. Defendants deny the remainder of Paragraph 97.

98.     On October 30, 2019, sixteen months after Debtors paid their initial payment to UpRight Law, eight months after Debtors had paid UpRight Law in full, all while Mr. Brucker's wages were subject to the Prestige wage garnishment proceeding, and, being subject to the Second Lawsuit in which Mr. Brucker paid $177.00 to appear in the case and had to appear in court on two different business days presumably missing work and the associated pay or incurring the expenditure of vacation or personal time, Mr. Buch filed the Bankruptcy Case.

  **ANSWER:**  Defendants admit only that Debtors' case was filed on October 30, 2019, they incorporate by reference their responses above to the allegations in the first four lines, and they lack knowledge sufficient to admit or deny the remainder of the allegations in Paragraph 98.

99.     Debtors are not the only assisted person represented by UpRight Law in the Southern District of Illinois where there were significant delays between payment in full to Upright Law and filing of the assisted person's bankruptcy case.

  **ANSWER:**  Defendants admit that the Bruckers were "assisted persons" and that they have represented clients in the Southern District of Illinois who are or were "assisted persons".  Defendants lack knowledge or information as to what the UST believes constitutes a "significant delay". Defendants deny the remainder of Paragraph 99.

100.     Moreover, Mr. Buch is not the only UpRight Law Local Attorney who has delayed

filing UpRight Law's clients' cases in the Southern District of Illinois. Accordingly, the delays from payment in full to filing are part of UpRight Law's pattern or practice in the Southern District of Illinois.

**ANSWER:**  Defendants admit that Mr. Buch is not the only UpRight Law attorney that has filed bankruptcy cases in the U.S. Bankruptcy Court for the Southern District of Illinois.  Defendants deny the remainder of Paragraph 100.

101.     Upon information and belief, the delays in filing UpRight Law's clients' cases result in part from UpRight Law's practice of providing clients little to no legal services until after clients are paid in full.

**ANSWER:**  Defendants deny Paragraph 101.

102.     Due to UpRight Law's business model, wherein UpRight Law systematically provides minimal administrative and clerical services and does not hand off cases to Local Attorneys to commence work on preparing and filing debtors' cases until after payment in full, Debtors suffered significant financial hardship and loss from the Prestige garnishment.

**ANSWER:**  Defendants deny Paragraph 102.

103.     Moreover, even after Mr. Buch was handed off the referral from UpRight Law on March 1, 2019, Debtors suffered further financial hardship and loss due to wage continuing garnishments for another ~~seven~~ eight months until their case was finally filed.

**ANSWER:**  Defendants admit that garnishments continued after March 1, 2019.

104.     Debtors' petition indicates that their debts are primarily consumer debts and they listed total property, including non-exempt property, totaling $5,987.00; as such, Debtors are an assisted person as that term is defined in 11 U.S.C. § 101(3).

**ANSWER:**  Defendants admit Paragraph 104.

### Count I – Violation of Section 526(a)(1) of Title 11

105.     All of the preceding paragraphs this Complaint are incorporated herein by

27

reference.

**ANSWER:**  Defendants incorporate their responses to preceding paragraphs of the Complaint by reference.

106.     UpRight Law is a debt relief agency as defined in 11 U.S.C. § 101(12A) and advertises its services as such.

**ANSWER:**  Defendants admit that UpRight Law advertises that it is a debt relief agency, and that it acted as a debt relief agency within the meaning of 11 U.S.C. §101(12A) in its representation of Bruckers.  Defendants deny the remainder of paragraph 106 to the extent it intends to contain or imply any other allegation.

107.     Mr. Buch is a debt relief agency as defined in 11 U.S.C. § 101(12A) and advertises his services as such.

**ANSWER:**  Defendants deny that Mr. Buch acted as a "debt relief agency" within meaning of §101(12A) in the representation of Bruckers, or that any of his advertisements indicated that he was a debt relief agency for purposes of the representation of the Debtors.

108.     At all times relevant to this complaint, the Debtors were prospective assisted persons or assisted persons as defined in 11 U.S.C. § 101(3).

**ANSWER:**  Defendants admit that for purposes of their bankruptcy case the Bruckers constituted "assisted persons" as defined in 11 U.S.C. § 101(3).  Defendants do not know what the UST believes to constitute "all relevant times" and therefore lacks information sufficient to admit or deny the remainder of Paragraph 108.

109.     UpRight Law advertises and offers bankruptcy assistance services, as defined in U.S.C. § 101(4A), and represents to substantially all potential clients and/or prospective assisted persons that it is efficient in the filing of bankruptcy cases and that it will provide immediate legal help to prospective assisted persons.

**ANSWER:**  Defendants admit that UpRight Law advertises and offers bankruptcy assistance

28

services as defined in 11 U.S.C. § 101(4A).  The remainder of Paragraph 109 is denied.

110.      In agreeing to represent Debtors in this Bankruptcy Case, and by entering into a representation agreement with Debtors to file a Chapter 7 Bankruptcy Case, UpRight Law represented to Debtors its ability to file a Chapter 7 Bankruptcy Case in the Southern District of Illinois within a reasonable amount of time after Debtors completed their payments to UpRight Law.

**ANSWER:**  Defendants deny Paragraph 110.  Further stating, the time when a case is filed depends upon various circumstances.

111.  Specifically, UpRight Law represented to Debtors that:

 **We fight for you.**  Once you sign, we will work tirelessly and fight for *your rights* to get you on the path to financial freedom.

✔ **We start work immediately.** We will start by *immediately* taking your creditor calls and preparing your case. As soon as your payment plan is completed, we will get you filed for bankruptcy.

**ANSWER:** Defendants admit that Paragraph 111accurately quotes a portion of the cover sheet to the retention agreement between UpRight Law and the Debtors. To the extent that Paragraph 111 purports to include other allegations, or that it is intended to imply that there are no other statements in the retention agreement that further explain the timeline and obligations of the parties, it is denied.

112.  The Retainer Agreement specifically represents: "***Firm will immediately begin providing Services and accrue billable time. Services include all representation to complete Client's legal matter,*** except Agreement does not include representation in any objection to discharge, adversary proceeding or any heavily contested matter or Services that could not have been contemplated after reasonable diligence by Firm when this Agreement was signed ("Additional Services")." (emphasis added)

**ANSWER:**      Defendants admit that Paragraph 112accurately quotes a portion of the retention agreement between UpRight Law and the Debtors. To the extent that Paragraph 112 purports to

include other allegations, or that it is intended to imply that there are no other statements in the retention agreement that further explain the timeline and obligations of the parties, it is denied.

113.    Neither UpRight Law nor Mr. Buch provided immediate legal help to the Debtors.

**ANSWER:**  Defendants deny Paragraph 133.

114.    Debtors sought assistance from UpRight Law on June 29, 2018.

**ANSWER:**  Defendants admit Paragraph 114.

115.    SCC Estes, a non-attorney salesperson for UpRight Law, provided Debtors with their initial legal consultation on behalf of UpRight Law on June 29, 2018.

**ANSWER:**   Defendants admit only that Mr. Estes, a non-attorney assistant, spoke with one or both of the Debtors on June 29, 2018.  Defendants deny the remainder of Paragraph 115.

116.    UpRight Law's non-attorney salesperson took payment from the Debtors, obtained from the Debtors their agreement to a "verbal retainer" to prepare and file a chapter 7 bankruptcy case, and set up a payment plan for them to pay for bankruptcy assistance on June 29, 2018, four days before Debtors spoke to an attorney.

**ANSWER:**   Defendants deny that any employees have the title or function "non-attorney salesperson."  Defendants admit that Mr. Estes set up a payment plan for the Debtors to pay for their bankruptcy assistance, on June 29, 2018. Defendants further admit that Mr. Estes provided a verbal disclosure to the Debtors on that day that they acknowledged.  Defendants deny the remainder of paragraph 116.

117.    Debtors signed their retainer agreement on June 29, 2018, four days before speaking with an attorney licensed to practice law in the State of Illinois.

**ANSWER:** Defendants admit only that Debtors signed a retention agreement on 6/30/2018, which was before they spoke with a licensed attorney.

118.   After Debtors' initial payment of UpRight Law's attorney's fees, participating in the "compliance" call with Mr. Mueller, and the signing of their retainer agreement with UpRight Law,

Mr. Brucker attended a hearing on the Second Lawsuit, paid the entry of appearance fee of $177.00 and was subjected to a judgment in the Second Lawsuit.

**ANSWER:** These allegations have already been made. Defendants incorporate by reference their responses above to these allegations.

119.   During the months from June 29, 2018 until February 28, 2019, UpRight did not provide the Debtors with a check list of documents to gather, did not begin to prepare or review the Petition, did not request that the Debtors save copies of paystubs and bank statements, and, contrary to their promises they would provide immediate legal help, failed to act with appropriate diligence to ensure the Debtors' case was filed in a diligent manner.

**ANSWER:** Defendants deny Paragraph 119 and that they failed to act with appropriate diligence.

120.   Despite speaking with SCC Estes, agreeing to retain UpRight Law, and making not only the initial payment but all of the payments pursuant to the UpRight Law retainer agreement, Debtors did not receive any substantive legal help from UpRight Law or Mr. Buch until nearly eight months later on March 13, 2019.

**ANSWER:** Defendants deny Paragraph 120.

121.   In this District, after its non-attorney salespersons sign up its clients, as part of its business model, UpRight Law has a pattern or practice of not providing prospective assisted persons and assisted persons with immediate substantive legal help or bankruptcy assistance for many months, until after the prospective assisted person and assisted persons have paid all attorney's fees and court filing fees in full.

**ANSWER:** Defendants deny this paragraph.

122.   In this District, after its non-attorney salespersons sign up its clients, as part of its business model, UpRight Law intentionally does not provide prospective assisted persons and assisted persons with immediate substantive legal help or bankruptcy assistance for many months, until after the prospective assisted person and assisted persons have paid all attorney's fees and court

filing fees in full.

  **ANSWER:** Defendants deny this paragraph.

123.   Debtors paid their attorney's fees and court filing fees in full to UpRight Law on February 28, 2019, but their bankruptcy case was not commenced on their behalf until eight months later on October 30, 2019.

  **ANSWER:** Defendants admit only that Debtors paid their attorney's fees and court filing fees in full to UpRight Law on February 28, 2019, and that their bankruptcy case was commenced on their behalf on October 30, 2019.

124.   From the date of Debtors' retention of UpRight Law on June 29, 2018 through the date when UpRight Law's attorney's fees and the court filing fee were paid in full on February 28, 2019, Mr. Brucker suffered wage garnishment deductions totaling $3,061.70.

  **ANSWER:** Defendants lack knowledge sufficient to admit or deny Paragraph 124.

125.   From the date when UpRight Law's attorney's fees and the court filing fee were paid in full by Debtors on February 28, 2019 through the date of the commencement of the Bankruptcy Case (October 30, 2019 – 244 after the fees were paid in full and 488 days after Debtors retained UpRight Law), Mr. Brucker suffered wage garnishment deductions totaling $2,766.19.

  **ANSWER:** Defendants lack knowledge sufficient to admit or deny Paragraph 125.

126.   In total, from the date Debtors retained UpRight Law to fight for them to get them on the path to financial freedom and to immediately start preparing their case, Debtors suffered wage garnishment deductions of $5,827.89, which sum was paid to Prestige on an unsecured, non- priority debt dischargeable in bankruptcy.

  **ANSWER:** Defendants lack knowledge sufficient to admit or deny Paragraph 126.

127.   UpRight Law and Mr. Buch failed to advise Debtors of available legal options which would have allowed Debtors to quickly file their petition for bankruptcy relief, including the option

to pay the Court filing fee through installments utilizing Official Form 103A, which would have allowed for the immediate invocation of the automatic stay and the termination of the weekly wage garnishment deduction against Mr. Brucker's wages.

**ANSWER:** Defendants deny this paragraph.

128.    UpRight Law and Mr. Buch failed to properly advise Debtors of the legal option to commence the Bankruptcy Case by filing the Voluntary Petition and the creditor matrix initially with the remaining required schedules within fourteen days thereafter, or such other time as the Bankruptcy Court may have permitted. Again, this would have allowed for the sooner invocation of the automatic stay and the termination of the weekly wage garnishment deduction against Mr. Brucker's wages.

**ANSWER:** Defendants deny this paragraph.

129.    UpRight Law has a demonstrated history of failing to timely file cases in the Southern District of Illinois, thus demonstrating a pattern or practice of excessively delayed case filing.

**ANSWER:** Defendants deny Paragraph 129.

130.    UpRight Law has been found by other bankruptcy courts not to timely file cases, thus demonstrating a pattern or practice of excessively delayed case filing.

**ANSWER:** Defendants deny Paragraph 130.

131.    UpRight Law and its local partner attorneys have filed numerous cases in this District since January 2019 which demonstrate lengthy filing delays from the time UpRight Law was paid in full.

**ANSWER:** Defendants deny Paragraph 131.

132.    UpRight Law has a clear and consistent pattern or practice of representing to debtors that it can, and will, file a bankruptcy case in this District within a reasonable amount of time, while at the same time having a demonstrated record of failing to do so.

**ANSWER:** Defendants deny Paragraph 132.

133.     UpRight Law failed to timely file a Chapter 7 Bankruptcy Case in the Southern District of Illinois after the completion of the Debtors' payments.

**ANSWER:** Defendants deny Paragraph 133.

**Count II- Violation of Section 526(a)(3) of Title 11**

134.     All of the preceding paragraphs of this Complaint are incorporated herein by reference.

**ANSWER:** Defendants incorporate their responses to preceding paragraphs of the Complaint by reference.

135.     UpRight Law is a debt relief agency as defined in 11 U.S.C. § 101(12A) and advertises its services as such.

**ANSWER:** Defendants admit that UpRight Law advertises that it is a debt relief agency, and that it acted as a debt relief agency within the meaning of 11 U.S.C. §101(12A) in its representation of the Bruckers.  Defendants deny the remainder of paragraph 135 to the extent it intends to contain or imply any other allegation.

136.     Mr. Buch is a debt relief agency as defined in 11 U.S.C. § 101(12A) and advertises his services as such.

**ANSWER:** Defendants deny that Mr. Buch acted as a "debt relief agency" within the meaning of 11 U.S.C. §101(12A) in the representation of the Bruckers, or that any of his advertisements indicated that he was a debt relief agency for purposes of the representation of the Debtors.

137.     At all times relevant to this complaint, the Debtors were a prospective assisted person or an assisted person as defined in 11 U.S.C. § 101(3).

**ANSWER:** Defendants admit that for purposes of their bankruptcy case the Bruckers constituted "assisted persons" as defined in 11 U.S.C. § 101(3).  Defendants do not know what the UST believes to constitute "all relevant times" and therefore lacks information sufficient to admit or deny the remainder of Paragraph 137.

34

138.    UpRight Law advertises and offers bankruptcy assistance services, as defined in 11 U.S.C. § 101(4A), and represents to substantially all potential clients and/or prospective assisted persons that it is efficient in the filing of bankruptcy cases and that it will provide immediate legal help to prospective assisted persons.

**ANSWER:**   Defendants admit that UpRight Law advertises and offers bankruptcy assistance services as defined in 11 U.S.C. § 101(4A). The remainder of Paragraph 138 is denied.

139.    In agreeing to represent Debtors in this Bankruptcy Case, and by entering into a representation agreement with Debtors to file a Chapter 7 Bankruptcy Case, UpRight Law represented to Debtors its ability to file a Chapter 7 Bankruptcy Case in the Southern District of Illinois within a reasonable amount of time after Debtors completed their payments to UpRight Law.

**ANSWER:**  Defendants deny Paragraph 110.  Further stating, the time when a case is filed depends upon various circumstances.

140.  Specifically, UpRight Law represented to Debtors that:

 **We fight for you.**  Once you sign, we will work tirelessly and fight for *your rights* to get you on the path to financial freedom.

 **We start work immediately.** We will start by *immediately* taking your creditor calls and preparing your case. As soon as your payment plan is completed, we will get you filed for bankruptcy.

**ANSWER:** Defendants admit that Paragraph 140 accurately quotes a portion of the cover sheet to the retention agreement between UpRight Law and the Debtors. To the extent that Paragraph 140 purports to include other allegations, or that it is intended to imply that there are no other statements in the retention agreement that further explain the timeline and obligations of the parties it is denied.

141.    The Retainer Agreement specifically represents: "***Firm will immediately begin providing Services and accrue billable time. Services include all representation to complete Client's legal matter,*** except Agreement does not include representation in any objection to discharge, adversary proceeding or any heavily contested matter or Services that could not have been

35

contemplated after reasonable diligence by Firm when this Agreement was signed ("Additional Services")." (emphasis added).

**ANSWER:** Defendants admit that Paragraph 141 accurately quotes a portion of the retention agreement between UpRight Law and the Debtors. To the extent that Paragraph 141 purports to include other allegations, or that it is intended to imply that there are no other statements in the retention agreement that further explain the timeline and obligations of the parties, it is denied.

142.    Neither UpRight Law nor Mr. Buch provided immediate legal help to the Debtors.

**ANSWER:** Defendants deny Paragraph 142.

143.    Debtors sought assistance from UpRight Law on June 29, 2018.

**ANSWER:** This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

144.    SCC Estes, a non-attorney salesperson for UpRight Law, provided Debtors with their initial legal consultation on behalf of UpRight Law on June 29, 2018.

**ANSWER:** This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

145.    UpRight Law's non-attorney salesperson took payment from the Debtors, obtained from the Debtors their agreement to a "verbal retainer" to prepare and file a chapter 7 bankruptcy case, and set up a payment plan for them to pay for bankruptcy assistance on June 29, 2018, four days before Debtors spoke to an attorney.

**ANSWER:** This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

146.    Debtors signed their retainer agreement on June 29, 2018, four days before speaking with an attorney licensed to practice law in the State of Illinois.

**ANSWER:** This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

147.   After Debtors' initial payment of UpRight Law's attorney's fees, participating in the "compliance" call with Mr. Mueller, and the signing of their retainer agreement with UpRight Law, Mr. Brucker attended a hearing on the Second Lawsuit, paid the entry of appearance fee of $177.00 and was subjected to a judgment in the Second Lawsuit.

  **ANSWER:** This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

148.   During the months from June 29, 2018 until February 28, 2019, UpRight did not provide the Debtors with a check list of documents to gather, did not begin to prepare or review the Petition, did not request that the Debtors save copies of paystubs and bank statements, and, contrary to their promises they would provide immediate legal help, failed to act with appropriate diligence to ensure the Debtors' case was filed in a diligent manner.

  **ANSWER:** Defendants deny these allegations.

149.   Despite speaking with SCC Estes, agreeing to retain UpRight Law, and making not only the initial payment but all of the payments pursuant to the UpRight Law retainer agreement, Debtors did not receive any substantive legal help from UpRight Law or Mr. Buch until nearly eight months later on March 13, 2019.

  **ANSWER:** Defendants deny Paragraph 149.

150.   In this District, after its non-attorney salespersons sign up its clients, as part of its business model, UpRight Law has a pattern or practice of not providing prospective assisted persons and assisted persons with immediate substantive legal help or bankruptcy assistance for many months, until after the prospective assisted person and assisted persons have paid all attorney's fees and court filing fees in full.

  **ANSWER:** Defendants deny these allegations.

151.   In this District, after its non-attorney salespersons sign up its clients, as part of its business model, UpRight Law intentionally does not provide prospective assisted persons and

assisted persons with immediate substantive legal help or bankruptcy assistance for many months, until after the prospective assisted person and assisted persons have paid all attorney's fees and court filing fees in full.

  **ANSWER:**  Defendants deny these allegations.

152.  Debtors paid their attorney's fees and court filing fees in full to UpRight Law on February 28, 2019, but their bankruptcy case was not commenced on their behalf until eight months later on October 30, 2019.

  **ANSWER:**  This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

153.  From the date of Debtors' retention of UpRight Law on June 29, 2018 through the date when UpRight Law's attorney's fees and the court filing fee were paid in full on February 28, 2019, Mr. Brucker suffered wage garnishment deductions totaling $3,061.70.

  **ANSWER:**  This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

154.   From the date when UpRight Law's attorney's fees and the court filing fee were paid in full by Debtors on February 28, 2019 through the date of the commencement of the Bankruptcy Case (October 30, 2019 – 244 after the fees were paid in full and 488 days after Debtors  retained UpRight Law), Mr. Brucker suffered wage garnishment deductions totaling $2,766.19.

  **ANSWER:**  This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

155.  In total, from the date Debtors retained UpRight Law to fight for them to get them on the path to financial freedom and to immediately start preparing their case, Debtors suffered wage garnishment deductions of $5,827.89, which sum was paid to Prestige on an unsecured, non- priority debt absolutely dischargeable in bankruptcy.

  **ANSWER:**  This allegation like many others in the Complaint is duplicative, and vexatiously so.

Defendants incorporate by reference their prior responses to this allegation.

156. UpRight Law and Mr. Buch failed to advise Debtors of available legal options which would have allowed Debtors to quickly file their petition for bankruptcy relief, including the option to pay the Court filing fee through installments utilizing Official Form 103A, which would have allowed for the immediate invocation of the automatic stay and the termination of the weekly wage garnishment deduction against Mr. Brucker's wages.

**ANSWER:** This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

157. UpRight Law and Mr. Buch failed to properly advise Debtors of the legal option to commence the Bankruptcy Case by filing the Voluntary Petition and the creditor matrix initially with the remaining required schedules within fourteen days thereafter, or such other time as the Bankruptcy Court may have permitted. Again, this would have allowed for the sooner invocation of the automatic stay and the termination of the weekly wage garnishment deduction against Mr. Brucker's wages.

**ANSWER:** This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

158. UpRight Law has a demonstrated history of failing to timely file cases in the Southern District of Illinois, thus demonstrating a pattern or practice of excessively or unnecessarily delayed case filings to the detriment of UpRight Law clients.

**ANSWER:** This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

159. UpRight Law has been found by other bankruptcy courts not to timely file cases, thus demonstrating a pattern or practice of excessively delayed case filing.

**ANSWER:** Defendants deny Paragraph 159.

160. UpRight Law and its local partner attorneys have filed numerous cases in this

District since January 2019 which demonstrate lengthy filing delays from the time UpRight Law was paid in full.

**ANSWER:**  This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

161.    UpRight Law has a clear and consistent pattern or practice of representing to debtors that it can, and will, file a bankruptcy case in this District within a reasonable amount of time, while at the same time having a demonstrated record of failing to do so.

**ANSWER:** Defendants deny Paragraph 161.

162.    UpRight Law failed to timely file a Chapter 7 Bankruptcy Case in the Southern District of Illinois after the completion of the Debtors' payments.

**ANSWER:**  Defendants deny Paragraph 162.

163.    Any express or implied representation to the Debtors that UpRight Law could, and would, immediately or even timely file a Chapter 7 Bankruptcy Case in the Southern District of Illinois after the completion of the Debtors' payments was false and misleading, and UpRight Law and Mr. Buch knew of the falsity of such representations at the time they were made, given its history of failing to timely file cases in this district.

**ANSWER:**  Defendants deny this Paragraph 163.

164.    UpRight Law and Mr. Buch knew, or reasonably should have known, that Debtors' case would not get filed with the Court immediately after their payment plan was complete, because neither UpRight Law nor Mr. Buch require (or even request) that Debtors provide the necessary documentation and information to complete the schedules and related documents until after the attorney's fees and court costs are paid in full.

**ANSWER:**  Defendants admit only that they knew that Debtors' case would not get filed with the Court immediately after the Debtors' payment plan was complete, and Defendants deny any implication that they committed literally to file Debtors' bankruptcy petition "immediately" upon

completion of the Debtors' payment plan.  Defendants lack knowledge sufficient to admit or deny the

remainder of this Paragraph 164.

### Count III - Disgorgement of Fees Paid Pursuant to 11 U.S.C. § 329(b) and Rule 2017

163.   All of the preceding paragraphs of this Complaint are incorporated herein by

reference.

**ANSWER:** Defendants state that this paragraph is mis-numbered by the UST in her Complaint,

as there is a prior paragraph 163.  Defendants incorporate their responses to preceding paragraphs of

the Complaint by reference.

164.     Debtors entered into a written retainer agreement with UpRight Law and

Mr.Mueller, and ultimately assigned to Mr. Buch, under which UpRight Law and Mr. Buch agreed

to represent Debtors in their bankruptcy case. Debtors paid UpRight Law and Mr. Buch together

attorney's fees of $1,725.00.

**ANSWER:** Defendants state that this paragraph is mis-numbered by the UST in her Complaint,

as there is a prior paragraph 164.  Defendants admit this Paragraph 164.

165.   The cover sheet to the Retainer Agreement provided, among other things, that:

 **We fight for you.**  Once you sign, we will work tirelessly and fight for *your rights* to get you on the path to financial freedom.

 **We start work immediately.** We will start by *immediately* taking your creditor calls and preparing your case. As soon as your payment plan is completed, we will get you filed for bankruptcy.

**ANSWER:** Defendants admit that Paragraph 165 accurately quotes a portion of the cover sheet to

the retention agreement between UpRight Law and the Debtors. To the extent that Paragraph 165

purports to include other allegations, or that it is intended to imply that there are no other statements

in the retention agreement that further explain the timeline and obligations of the parties it is denied

166.   The  Retainer  Agreement  specifically  represents:  "***Firm will immediately begin***

*providing Services and accrue billable time. Services include all representation to complete Client's legal matter,* except Agreement does not include representation in any objection to discharge, adversary proceeding or any heavily contested matter or Services that could not have been contemplated after reasonable diligence by Firm when this Agreement was signed ("Additional Services")." (emphasis added)

**ANSWER:**  This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

167.    Despite the foregoing, Debtors were sued by at least one creditor and subjected to judgment and collection between the time they first engaged UpRight Law and when their Bankruptcy Case was filed.

**ANSWER:**  This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

168.    Mr. Brucker's wages continued to be subject to the Prestige wage garnishment action even after Debtors Retained UpRight Law and until their Bankruptcy Case was filed.

**ANSWER:**  This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

169.    Debtors sought assistance to file a bankruptcy case and contacted Upright Law because they believed UpRight Law's advertisements that it would be able to help them in that regard.

**ANSWER:**  Defendants lack information sufficient to admit or deny this allegation.

170.    Debtors then were forced to wait 488 days *after* UpRight Law began first providing bankruptcy assistance and eight months *after* having paid UpRight Law in full before UpRight Law finally commenced their Bankruptcy Case.

**ANSWER:**  This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

171.    During this 488 day time period, Debtors were subjected to the Second Lawsuit, paid

the State Court entry of appearance fee of $177.00, wasted their time contesting the Second Lawsuit, and, most importantly, needlessly lost thousands of dollars ($5,827.89) through the Prestige wage garnishment proceeding.

**ANSWER:** This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

172.    Despite ample opportunity to do so, UpRight Law failed to timely provide Debtors with the necessary requirements and documentation that would be required of them in order to complete their bankruptcy paperwork and commence the bankruptcy case within a reasonable time.

**ANSWER:**  Defendants deny this allegation.

173.    When UpRight Law advised Debtors of the documentary requirements to complete their bankruptcy paperwork, UpRight Law erroneously insisted that in order to file their case, it was *absolutely mandatory* that UpRight Law have every pay advice for the six month period ending in the month prior to the filing of the case.

**ANSWER:**  Defendants deny Paragraph 173.

174.    Despite ample opportunity to do so, UpRight Law failed to timely provide Debtors with the legal options available to them to quickly file their bankruptcy case, including the option to pay the court filing fee in installments. By seeking to pay the filing fee in installments, Prestige's wage garnishment would have immediately ended and Debtors could have then used those wages which would have been garnished to pay the court filing fee in five weeks or less.

**ANSWER:**  Defendants deny this allegation.

175.    UpRight Law knew or should have known at the time of their phone call with Mr. Estes, a non-attorney UpRight Law employee, on June 29, 2018, that Mr. Brucker's wages were being garnished by Prestige and that one option to getting the case filed in a timely manner was for Debtors to seek to pay the court filing fee in installments.

**ANSWER:**  Defendants deny this allegation.

43

176.    With this knowledge, UpRight Law should have advised Debtors that if it is against UpRight Law's policy of seeking to pay the filing fee through Court approved installments, they might want to consider other lawyers who might be willing to seek a Court Order allowing for the payment of the filing fee in installments.

**ANSWER:**  Defendants deny this allegation.

177.    With the knowledge of the Prestige wage garnishment proceedings, UpRight Law should have advised on or about June 29, 2018 exactly what documents and information would be required of them in order to immediately file their bankruptcy case upon completion of their payment of UpRight Law's attorney's fees. This information was not provided by UpRight Law until at or near the date that Debtors paid UpRight Law's attorney's fees and the court filing fee in full.

**ANSWER:**  Defendants deny this allegation.

178.    UpRight Law's delay in the filing of the Bankruptcy Case caused Debtors to have to complete the pre-filing credit counseling class twice, resulting in Debtors having to pay the fee for the class a second time.

**ANSWER:**  Defendants deny this allegation.

179.    Moreover, the total attorney fee Debtors paid to UpRight for legal representation in their bankruptcy case is substantially higher than the average fee charged by Local Attorneys who practice in this District when they are not associated with UpRight Law.

**ANSWER:**  This allegation like many others in the Complaint is duplicative, and vexatiously so. Defendants incorporate by reference their prior responses to this allegation.

180.    Specifically, the customary rate charged by Mr. Buch when he files a chapter 7 bankruptcy case for clients who are not UpRight Law clients is $1,120.00.

**ANSWER:**  Defendants admit only that Mr. Buch has charged $1,120.00 in some cases handled in his separate practice, and deny the remainder of this paragraph.

181.    During the time between when Debtors initially retained UpRight Law and when Mr.

44

Buch personally met with the Debtors thirteen days (on March 13, 2019) after they had paid in full

UpRight Law's fees, Debtors received little to no legal assistance from UpRight Law lawyers. In

fact, the only two calls between Debtors and UpRight Law, in that time period, were handled by non-

lawyer staff. As such, Debtors did not receive any real added value from UpRight Law's services that

justifies and makes reasonable its higher fees compared to the $1,120.00 customarily charged by Mr.

Buch in non-UpRight Law cases.

   **ANSWER:**  Defendants deny this allegation.

      182.   Even though this case was clearly not filed in a rush, the information contained in the

filing was inaccurate. Specifically, the Statement of Financial Affairs incorrectly set forth

exactly which creditor it was that was garnishing Mr. Brucker's wages, the Lawsuit information

relating to Prestige and the repossession activity of Prestige. It was Prestige who was garnishing Mr.

Brucker's wages and not Ms. Oliver as part of the Second Lawsuit.

   **ANSWER:**  Defendants deny this allegation.

      183.   All compensation paid by Debtors to UpRight Law for the basic bankruptcy

services provided over the many number of months of its retention due to UpRight Law's own

apparent disregard and lack of urgency and diligence is unreasonable and excessive. Accordingly,

such fees must be disgorged back to the Debtors pursuant to 11 U.S.C. § 329 and Fed.R.Bankr.Proc.

2017.

   **ANSWER:**  Defendants deny this allegation.

      184.   Under the facts and circumstances of this Bankruptcy Case, including Debtors' loss

of $5,827.89 in garnished wages, the retention of any fees by UpRight Law is unreasonable and

unconscionable.

   **ANSWER:**  Defendants deny this allegation.

      185.   As a direct result of UpRight Law's failure to immediately or even timely file

Debtors' bankruptcy case, Debtors lost wages through the Prestige wage garnishment proceedings in

the amount of $5,827.89.

**ANSWER:** Defendants deny this allegation.

## II.    DEFENSES

Without assuming any burden of proof, the Complaint is subject to the additional legal defenses set forth below. These additional defenses are asserted based on information currently available to them. Defendants reserve the right to add any additional defenses that may become evident during the course of this litigation.

### Due Process – Excessive Penalty Sought

186.    The Complaint violates Due Process because it purports to seek grossly excessive penalties. For a flat fee of $1,725, Defendants obtained a discharge on behalf of the Debtors and have provided a host of additional services to the Debtors post-petition. Nevertheless, the Complaint purports to seek some $55,000 in civil penalties from the Defendants. The demand seeks an excessive penalty that violates the Due Process clause of the Fifth Amendment. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425 (2003) ("Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

### Due Process and Rule 65 – Unspecific injunction

187.    The Prayers for relief in Counts I – II purport to seek an injunction that would prohibit UpRight Law from "engaging in conduct that would violate Section 526(a)." Such requests for an "obey the law" injunction violate Fed. R. Civ. P. 65 and Due Process. *See, e.g., S.E.C. v. Sky Way Global, LLC*, 710 F. Supp.2d 1274, 1280 (M.D. Fla. 2010) (an "obey-the-law" injunction not only fails to provide a defendant with sufficient notice as to what it must do to obey the injunction, it also allows enforcement agencies to circumvent the defendant's Due Process rights by way of contempt proceedings, no matter how distinct the future violation may be); *In re Foster*, 586 B.R. 62, 86 (Bankr. W.D. Wash. 2018) ("The U.S. Trustee's request to enjoin Mr. Bellum and UpRight

Law from all future violations of LRB 5005-1(d)(2) is impermissibly vague."); *In re Bishop*, 578

B.R. 158, 166 (Bankr. W.D.N.Y. 2017) (denying with prejudice the United States Trustee's claim

for an "obey the law" injunction pursuant to § 526 sought against UpRight Law).

### First Amendment Violation

188.   The UST's requests for injunctive relief in Counts I and II are also defective

because they infringe UpRight Law's First Amendment rights. Count II purports to prohibit UpRight

Law from representing to Debtors that it is "efficient," that it is able to timely file a case, or that it

will provide "immediate legal help."  The UST also seeks to attempt to enjoin UpRight Law from

representing "to Debtors that it will provide a free consultation."

189.   The injunctions sought are designed to target certain aspects of UpRight Law's

advertising. These advertisements constitute commercial speech. Commercial speech is entitled to

protection under the First Amendment.

190.   Statements relating to "efficiency" are not alleged to be false.  The UST has no

substantial interest in regulating such a statement.

191.   The statement relating to providing "immediate legal help" is not misleading.  The

UST has no substantial interest in regulating such a statement, which was not misleading.

192.   The statement relating to a "free consultation" is also not misleading. The Debtors

engaged the firm to represent for a flat attorney fee of $1,725. The UST cannot allege, let alone

prove, that Debtors were "charged" for any particular portion of the representation. The UST has no

substantial interest in regulating such a statement, which was not false or misleading.

193.   Moreover, the injunctions are more extensive than necessary to advance any

legitimate governmental interest.  In that regard, the UST purports to seek an outright prohibition on

UpRight Law's use of certain expressions, rather seeking clarifications of the terminology or

underlying modifications to the firm's procedures. The relief sought by the UST, if awarded, would

violate Defendants' First Amendment rights.

## Due Process – Lack of Neutral Arbiter

194.    One of the basic procedural requirements of an adversary proceeding is that it be presided over by a neutral factfinder. *See Fulton v. McVay,* 318 B.R. 546 (D. Colo. 2004). Yet, this adversary proceeding is pending before the same Bankruptcy Court that ordered the UST to conduct an investigation of UpRight Law.

195.    Moreover, the Bankruptcy Court purports to have made factual findings relating to the Brucker bankruptcy despite the fact that there was no evidentiary hearing in the underlying Bankruptcy case. In that sense, the Bankruptcy Court has prejudged the merits of this case. The Bankruptcy Court cannot preside over this case without violating Defendants' due process right to a neutral factfinder.

## Waiver/Estoppel/Ratification – §329 Claim

196.    The Chapter 7 Trustee handbook sets forth the procedure that governs the review of attorney compensation in Chapter 7 bankruptcy cases. Under the procedures included in Chapter 7 Trustee handbook, the Chapter 7 Trustee is charged with reviewing the reasonableness of the attorney fee in the first instance.

> The trustee must review this disclosure of compensation and make an independent determination whether the fee paid or agreed to be paid is excessive. 11 U.S.C. §704(a) If the fee is excessive, the trustee must discuss with the United States Trustee the possibility of bringing the matter before the court for a review of fees pursuant to section 329(b) and Rule 2017(a). 28 U.S.C. § 586.

197.    The Chapter 7 Trustee did not make any determination that the attorney fee was excessive in this case, in his final report or otherwise.

198.    Pursuant to Fed. R. Bankr. Proc. 5009, the UST had 30 days to object to the final Chapter 7 Trustee's report. If the UST had any issue with the attorney fee charged in this case, it was incumbent upon her to object timely to the report. However, she made no such objection.

199.    These procedures exist to ensure a prompt and efficient determination of issues relating to the reasonableness of an attorney fee in a Chapter 7 case. The UST's failure to timely

object to the fee constitutes a waiver. The UST's failure to object also constitutes the UST's ratification of the fee, and the UST is estopped from asserting a §329 claim.

### UST has unclean hands – §329 claim

200.   To the extent that the UST purports to seek disgorgement of the attorney fee based on relative comparisons to other practitioners in the Southern District of Illinois, she possesses unclean hands.

201.   No presumptive maximum reasonable fee has been set in the Southern District of Illinois for more than 20 years. Courts and commentators alike have remarked that the establishment of such fees can serve as a time-saving device for courts, practitioners, and trustees alike.

202.   After UpRight Law began receiving notices relating to its disclosures of compensation – that UpRight Law understood based on incomplete information somehow to pertain to the amount of fees it charged *relative* to other firms that practiced in the Southern District of Illinois – UpRight Law sought the establishment of a presumptive fee for Chapter 7 cases.

203.   The UST nevertheless successfully *opposed* the establishment of such a reasonable presumptive fee.

204.   As a result, there is no presumptive reasonable fee in the Southern District of Illinois. To the extent that the UST challenges to UpRight Law's fees based on *relative* comparisons, by frustrating the Defendants' efforts the UST has unclean hands.

### Equal Protection – Selective Prosecution

205.   The United States Trustee for Region 10 ("UST") is engaging in discriminatory enforcement against Defendants in numerous respects that violate their equal protection rights.

206.   The UST has singled out UpRight Law and subjected it and its affiliated attorneys to differential treatment relative to other consumer bankruptcy law firms and consumer bankruptcy lawyers that file consumer bankruptcy petitions in U.S. Bankruptcy Court for the Southern District of Illinois.

207.    These other bankruptcy consumer bankruptcy firms and attorneys who file consumer bankruptcy petitions in the Southern District of Illinois are similarly situated to UpRight Law and there is no rational basis for the UST's differential treatment of UpRight Law or its affiliated attorneys.

208.    The UST has advanced its selective enforcement campaign against the Defendants by bringing enforcement actions against UpRight Law based on legal positions that she has not asserted against other law firms – legal positions that attempt to ignore the problematic legal framework that governs the treatment of attorney fees in Chapter 7 cases.

209.    The effect of the UST's selective enforcement scheme has been to impose litigation costs and costs of representing Chapter 7 clients that have caused UpRight Law to cease to take on new Chapter 7 clients in the Southern District of Illinois.

210.    Current law treats Chapter 7 attorney fees as dischargeable upon the filing of a bankruptcy petition.  As a result, many bankruptcy practitioners will not file a bankruptcy petition until the client has paid his or her fees in full, a reality that the U.S. Supreme Court has long recognized.  See *Lamie v. U.S. Tr.*, 540 U.S. 526, 528, 124 S. Ct. 1023, 1026, 157 L. Ed. 2d 1024 (2004) (noting the "common practice of paying counsel compensation in advance" in Chapter 7 bankruptcies).

211.    At the same time, many individuals who would benefit from filing for bankruptcy under Chapter 7 struggle to come up with the funds necessary to afford counsel, as this problem has been well documented.  *See generally* FINAL REPORT OF THE ABI COMMISSION ON CONSUMER BANKRUPTCY (2017-2019), Sec. § 3.01 at 90 (emphasis added); Paul Kiel, *Commentary: What if you can't afford to go bankrupt?,* Chicago Tribune, March 5, 2018 (noting that "[p]eople are too broke to go bankrupt.");   "*No Money Down" Bankruptcy*, Pamela Foohey, Robert M. Lawless, Katherine Porter, & Deborah Thorne, SOUTHERN CALIFORNIA LAW REVIEW, VOLUME 90: 1055, 1055 (noting the common difficulty that prospective debtors face in affording attorney fees in advance of filing).

212.    The Final Report of the ABI Commission correctly identifies the treatment of attorney fees in Chapter 7 cases as an issue that hinders access to the bankruptcy system and restricts access to justice.  *See generally* FINAL REPORT OF THE ABI COMMISSION ON CONSUMER BANKRUPTCY (2017-2019), Sec. § 3.01 at 89.  The ABI Commission Report further notes that "[u]nder this state of the law, an attorney offering representation to potential Chapter 7 debtors has four fee options, each of which produces undesirable results." (*Id*. at 90).

213.    As the ABI Commission Report reflects, one of the ways in which consumer debtor attorneys attempt to assist clients who cannot afford to pay their fees in a lump sum at the outset of their case, is through the acceptance of payments in installments.  The ABI Commission's Report notes that this is an imperfect solution because of some of the negative potential consequences to the debtor.  Among them, the ABI Commission has noted, it results in delays in the preparation of filing of Chapter 7 Bankruptcy Petitions, if the client's case ends up getting filed at all.  *See id*. at 92 (noting that such an arrangement is imperfect, inter alia, because "the delay in filing may cause harm to the client, and the attorney may deduct expenses from any refund if the case is not filed.")

214.    The ABI Report is also clear that there are no good alternatives to such an arrangement. One of the other fee options available to attorneys is that "the debtor can file the case under Chapter 13 instead of Chapter 7." (*Id.* at 91).  However, as the ABI Commission report notes, this option has negative potential consequences – Chapter 13 imposes additional costs on the debtor, both in higher fees and in the requirement that the debtor devote all disposable income to paying claims under the plan." (*Id.* at 91-92).  The ABI Commission Report notes other drawbacks as well: "If the court does dismiss the case, the debtor will not only fail to receive a discharge but also will lose any fees paid to the attorney and chapter 13 trustee, as well as other costs the debtor has incurred in filing." (*Id*. at 92).  Finally, the ABI Commission Report notes that it "may be unethical for an attorney to file a Chapter 13 case for a client when Chapter 7 provides the relief that the client needs, simply because the attorney prefers the more secure fee payment in Chapter 13." (*Id*.).

215.    The other two options outlined in the ABI Committee's report are also problematic – one of the options results in a "low probability" of debtors' attorneys being paid.[1]  *See* FINAL REPORT OF THE ABI COMMISSION ON CONSUMER BANKRUPTCY (2017-2019), Sec. § 3.01 at 91.  The other involves bifurcating payments in a manner that can be, according to the ABI Commission, highly problematic.  *Id*.  Indeed, the UST Program has brought numerous enforcement actions against practitioners that use bifurcated fee agreements.

216.    These problems have caused courts and commentators alike to observe that the dysfunctional nature of the law governing attorney fees in Chapter 7 Bankruptcy cases raises significant concerns about practitioners' willingness to represent Chapter 7 clients.  *See, e.g., Gordon v. Hines*, 147 F.3d 1185, 1190 (9th Cir. 1998) ("[B]ecause no existing solution is totally satisfactory, it is only the rarity of litigated disputes in this area (as a practical matter) that avoids a real chilling of competent counsel's willingness to represent Chapter 7 debtors."); *There's a Storm A Brewin: The Ethics and Realities of Paying Debtors' Counsel in Consumer Chapter 7 Bankruptcy Cases and the Need for Reform*, 94 Am. Bankr. L.J. 387, 388 (legal treatment of Chapter 7 fees portends a shortage of attorneys willing to represent Chapter 7 Debtors in the post-pandemic world).

217.    Well aware of these problems in the underlying legal framework, the UST has selectively and unfairly attempted to seize these upon these dysfunctional rules against Defendants by seeking to impose liability on Defendants for them for the negative byproducts that flow from these rules. For instance, the UST repeatedly makes allegations that appear to suggest that *Defendants* somehow are responsible for their clients' economic hardships, and any negative development that transpires while the client is making installment payments.  (*See, e.g.,* ¶¶126-128). As far as Defendants have been able to discern, the UST has never taken a similar position with

---

[1] It is not reasonable to expect debtors' attorneys to work for free any more than it would be to expect other providers of service in the bankruptcy system to do so, including bankruptcy judges and trustees.  Nor is it reasonable (or lawful) for the UST to engage in discrimination that is designed to ensure that certain firms must work for free, while others are not required to do so.

respect to any other law firm, and never brought an adversary predicated on delays in filing that occur while a debtor is paying his or her fees in installments.

218.    Further, the ABI Report observes that lengthy delays in filing bankruptcy are not uncommon, and specifically explains that this is in part due to the unpredictable nature of obtaining cooperation from debtors (*see* FINAL REPORT OF THE ABI COMMISSION ON CONSUMER BANKRUPTCY (2017-2019), at §3.07 at 132):

> Debtors rarely provide to their attorneys all needed information at one time. They also often struggle to come up with the funds needed to file, including filing, credit counseling and attorney fees. As a result, an anticipated filing date is often postponed, requiring the attorney to recalculate the CMI and collect additional documentation based on a new filing date. For some debtors, such recalculations may be required multiple times.

219.    Hence, the Bankruptcy community widely acknowledges that part of the delays inherent in many consumer bankruptcy cases is a lack of consistent cooperation from debtors – a lack of cooperation that can necessitate redoing certain types of work necessary for the filing of the bankruptcy petition.

220.    Notwithstanding these realities of the consumer bankruptcy system, the UST has elected to selectively bring adversary proceedings (including the instant Complaint) against UpRight Law and its affiliated attorneys, improperly seeking to hold Defendants accountable for byproducts of the dysfunctional rules that govern consumer bankruptcy, including delays in filing.

221.    Neither 11 U.S.C. §329 or §526 impose any time requirement in which a debtor, or debtor's counsel, must commence a bankruptcy petition.  Moreover, on information and belief, the UST has never developed or articulated presumptively reasonable time frames in which a consumer bankruptcy petition must be filed (either from the time of engagement or the time a client has paid their fees in full).

222.    Notwithstanding the absence of such authorities or guidelines, the UST has brought numerous adversary proceedings that selectively and arbitrarily assert that Defendants have

unreasonably delayed the filing of bankruptcy petitions.  This has been in addition to scores of Rule 2004 Examinations that the UST has sought pertaining to alleged investigations of UpRight Law's representation of its clients.

223.    One of the hallmarks of the UST's selective enforcement campaign against UpRight Law has been to abuse the bankruptcy and judicial processes so as to impose massive litigation costs and burdens upon Defendants.  These tactics have included, but not been limited to: (a) opposing efforts by UpRight Law to seek the establishment of a presumptively reasonable fee for Chapter 7 bankruptcies in the Southern District of Illinois; (b) opposing Motions to Close in dozens of bankruptcy cases in which the presumption of full administration has arisen (and where the UST did not object to the Chapter 7 Trustee's final report); (c) seeking more than **100** Rule 2004 Examinations in furtherance of investigations of UpRight Law that have nothing to do with the debtor's bankruptcy estate or the debtor's right to a discharge; (d) using Rule 2004 Examinations to attempt to persuade UpRight Law's clients (who have had no complaint about the representation) that they have somehow been wronged by UpRight Law; and (e) using costly adversary proceedings, rather than the objection process in the underlying bankruptcy, to challenge the alleged excessiveness of UpRight Law's attorney fees.

224.    The UST's approach – not making a fee objection in the bankruptcy, seeking (and taking) Rule 2004 Examinations for the purpose of investigating UpRight Law, and then filing adversary proceedings that seek disgorgement of fees – has multiplied these proceedings and sharply driven up Defendants' costs.

225.    Moreover, the UST has used the Rule 2004 Examinations not merely to investigate facts, but also to influence the content of the debtors' testimony, which is improper.

226.    The UST has taken legal positions against the Defendants that she has not taken against any other lawyer or law firm in the Southern District of Illinois, and has used unique, improper, and extraordinarily burdensome investigatory procedures against Defendants.

227.     These other consumer bankruptcy law firms and attorneys in the Southern District of Illinois are similarly situated to Defendants.  The UST has imposed differential treatment upon Defendants without a rational basis.  The UST's selective enforcement campaign, pursued in the absence of rational basis, has violated the Defendants' equal protection rights.

**Laches**

228.     The UST delayed in asserting the claims in this case.

229.     The delay was not reasonable or excusable and was in fact affirmative misconduct against Defendants.

230.     The UST acquiesced in the acts about which the UST complains.

231.     Defendants have suffered prejudice resulting from the delay because Plaintiff's' inaction and silence led Defendants to continue retaining clients and filing petitions in the Southern District of Illinois and charging similar rates for a period of several years prior to any action by the UST.

232.     Even after the issue of attorney compensation was raised by the Bankruptcy Court, the UST took no action with respect to the amount of attorney fees charged for a period of approximately two years.

233.     According to the Department of Justice Handbook for Chapter 7 Trustees, ""The trustee must review this disclosure of compensation [filed by the debtor's attorney] and make an independent determination whether the fee paid or agreed to be paid is excessive. 11 U.S.C.§704(a) If the fee is excessive, the trustee must discuss with the United States Trustee the possibility of bringing the matter before the court for a review of fees pursuant to section 329(b) and Rule 2017(a). 28 U.S.C. § 586."

234.     The Chapter 7 Trustee noted no objection to the fee in this case in his final report, and the UST did not file any objection to the final report, including the amount of the fees.

235.     On information and belief, the UST did not any object to any final report filed by

any Chapter 7 Trustee in a case filed by UpRight Law relating to the amount of the fee for a period of several years before the Brucker bankruptcy was filed.

236.    Laches is a defense that may be maintained against the UST in this case. See e.g. *United States v. Admin. Enterprises, Inc*., 46 F.3d 670, 673 (7th Cir. 1995).

237.    If the UST believed that the fees charged by UpRight Law were generally excessive for Chapter 7 cases, it was incumbent upon her to raise a formal objection earlier. Moreover, the UST continued to be unclear about the amount of the attorney fee a Chapter 7 practitioner can charge for bankruptcies in the Southern District of Illinois in order to avoid scrutiny of the fee based on the amount charged to the detriment of Defendants.

### Failure to state a claim upon which relief can be granted

238.    Defendants incorporate by reference all of their arguments made pursuant to Fed.R. Civ. P. 12(b)(6) in their Motion to Dismiss. (Doc. 5 and 5-1).

### III.    JURY DEMAND

Defendants demand a trial by jury on all issues that are triable by a jury.

Dated: February 11, 2020                    Respectfully submitted,

*/s/ Mark T. Lavery*
Mark T. Lavery
Illinois Bar No 6271291
Attorney at Law
15774 S. LaGrange
Orland Park, IL 60462
(P) (708)274-6803
laverylawyer@gmail.com


Charles A. Armgardt
Illinois Bar No 6328149
UpRight Law LLC
Of Counsel
79 W Monroe St, Suite 1006
Chicago, IL 60603
(P) (877) 927-5451
carmgardt@uprightlaw.com

*Counsel for Defendants Deighan Law LLC,*
*doing business as UpRight Law LLC*
*and Ronald Buch*

## CERTIFICATE OF SERVICE

I certify that on February 11, 2021, I filed the foregoing Defendants' Answer to the Adversary Complaint of the United States Trustee through the Court's CM/ECF system, which will effect service upon all counsel registered to receive notice through that system.

*/s/ Mark T. Lavery*